102 N.J. Super. 102 (1968)
245 A.2d 495
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MONIQUE VON CLEEF AND JAMES ALBERT BEARD, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 27, 1968.
Decided July 2, 1968.
*104 Before Judges GOLDMANN, KILKENNY and CARTON.
Mr. Herald Price Fahringer, Admitted Pro Haec Vice, argued the cause for appellants (Mr. Leonard Etz, attorney; Mr. William J. Kearns, Jr., of counsel).
Mr. Alan Silber, Assistant Prosecutor, argued the cause for respondent (Mr. Joseph P. Lordi, County Prosecutor of Essex County, attorney).
The opinion of the court was delivered by CARTON, J.A.D.
Defendants appeal from convictions of (1) conspiring to maintain a building for purposes of lewdness and to commit acts of lewdness with others in private, in violation of N.J.S. 2A:98-1, 2A:133-2 and 2A:115-1; (2) permitting a building to be used for purposes of lewdness and assignation with reasonable cause to know of such use, in violation of N.J.S. 2A:133-2(b), and (3) possessing with intent to utter obscene publications, in violation of N.J.S. 2A:115-2.
Defendant Marianna, or Monique, Von Cleef was sentenced on the conspiracy charge to a term of 18 months in the County Penitentiary (four months to be served in custody and the balance on probation). Defendant Beard was fined $500 on this charge and placed on probation for 18 months. *105 The sentences were suspended as to both defendants on the remaining charges.
About the middle of October 1963 Detective Lieutenant Magnusson, Obscenity Investigations Specialist of the Essex County Sheriff's Office, received from a citizen a copy of a publication known as Flair. He gave it to John Kallies, Postal Obscenity Specialist for the New Jersey area and with whom Magnusson collaborated in investigating obscenity matters involving the United States mail.
Since Flair Publications was indicated as located in New York City, Kallies sent the copy of Flair there. Kallies reported to Magnusson that Flair had a post office box in New York City, signed for by a James Beard. Sometime before receiving this copy of Flair, Magnusson had obtained a copy of another similar publication known as La Plume, which he described as "one of the forerunners of the sex-type clubs * * * probably one of the most active in the country." Magnusson had learned through New York Postal Inspector Dolan that a photograph of Monique Von Cleef appeared in this particular edition with a code number of 174 and the following caption:
"N.Y.C.  Exotic Miss, 30 yrs. 36-26-36. Extremely interested in rubberwear, satin, french lingerie, discipline, etc.; Anxious to experiment. Will correspond with all. Write descriptively. Photo appreciated."
Sometime in the middle of December 1965 a letter came into the hands of Inspector Kallies, addressed to one TS (initials ours), reading as follows:
"T.
My new telephone number is 201 484-0840. The charge for consultation is $50.00.
/s/ Superior Monique"
Kallies turned this letter over to Magnusson, who ascertained on December 20 from the New Jersey Bell Telephone Company that the telephone number was registered or listed in *106 the name of "Marianna Von Cleef, 850 Lake Street, Newark." The premises were owned by her. After a consultation with Inspector Kallies, he called that number and spoke to defendant Von Cleef, pretending that he was TS, the addressee of the letter. He made an appointment to meet her at 850 Lake Street the next day for the purpose of receiving "an hour and a half of discipline." This call was tape-recorded and immediately transcribed.
On December 21, Magnusson, Kallies and three other police officers went to the vicinity of 850 Lake Street at the appointed hour. Magnusson entered the building. The others remained outside in their vehicle until 1:30 P.M. pursuant to a prearranged plan that they enter the premises after half an hour. After being admitted by a workman and inquiring for "Monique," Magnusson was greeted by defendant Beard, who ushered him up to the second floor where he was told to wait for Monique. He testified that after a short time defendant Von Cleef came into the room saying to him, "Hello. You are Mr. S?" and when he replied, "Yes" she said "Come with me." She led him up a stairway to the third floor, through a bedroom and into what he described as a "living room or sitting room in the front of the house." She told him to take off his coat and to make himself comfortable.
Magnusson testified that at this point Miss Von Cleef handed him a copy of a publication called Spankers Monthly, asking him if he was familiar with it, to which he said, "Not specifically this one, but others like it." Then she said, "Let me get you a drink" and added, "You can read the publication. It will excite you."
Miss Von Cleef then left the room and came back in three or four minutes with a ten-ounce glass that had about five or six ounces of scotch in it and some water. "She gave it to me and told me `You know, this will help you to relax' and she seated herself on the couch."
A conversation followed between them about Monique's career as a professional sadist. During this conversation there was a discussion of flagellation, sadism and tranvestism. *107 She inquired whether he was familiar with the La Plume publication, saying that she was familiar with it and knew the owner who had put her in contact with other people. Replying that he was acquainted with La Plume, he remarked to her: "That's where I first saw your picture, in La Plume." Magnusson also testified that he asked her if she did much of this type of thing, to which she replied that she was "very knowledgable" in this area and "has clients all over the country and flies to a lot of people to take care of this business." To his statement, "You must really know your business," she responded she was "quite experienced at this."
Asked to tell her about himself, he demurred, remarking that he could not say too much because he had to be "discreet." The following then took place:
"* * * She said, `How can I help you if you won't tell me about yourself?' I said, `Well, I see what you mean.'

* * * * * * * *
THE COURT: All right, you may continue.
A Well, I explained that I hadn't had too much experience at being the servant of a professional sadist, and she asked me, she said `Well, when did you first start liking to be whipped? I said  let's see  I said that I had had an experience with a girl whom I knew and I went out with and we engaged in flagellation, and she would whip me to a point where I would be sexually aroused, and then we would consummate the normal sex act, and Miss Von Cleef at this point said, `Well, I won't have intercourse with you.' I said, `No. I realize that you're just going to whip me until I have an orgasm, and Miss Von Cleef said, `Yes.'
Q Then what occurred, if anything?
A When she asked me about it, when did it first start, I also stated that you can't find too many people who know about this or who really understand it, and she acknowledged that, `Yes, I understand that', and she made a reference that in Europe this practice is quite common and that she thoroughly understood it."
The discussion concluded with Magnusson's inquiry as to how long he could stay and her reply, "Oh, about a half hour or so, depending on how I like you, and so on." Magnusson stated that Miss Von Cleef then arose from the couch, produced a pair of women's high-heeled shoes, brought them over *108 and dropped them on the floor saying: "Now take off all your clothes and put these on. * * * When I come back, I want to see you on that bed in a kneeling position. * * * All your clothes off. I'm the boss."
The detective removed his tie, shirt, undershirt and shoes and socks. While defendant was out of the room, he opened a door into another room in which he observed a black object on legs having a hole in it, later identified as a torture box. As he looked out in the hall, he said he also saw Miss Von Cleef in the process of donning her costume. When she came back into the room she asked why he was not undressed and upbraided him for taking so long. She was attired, he said, in black high-heeled shoes, net stockings and a "tight-fitting rubber apparatus which would resemble a bathing suit." Saying that he was a little nervous, he proceeded to the lavatory. On the way there he observed a strap about 16 inches long on the bed.
At this point the police officers burst into the room where they found Magnusson and Monique. Magnusson informed defendant she was under arrest and a thorough search of the entire house followed.
On the second floor were found and seized the following items: About 200 boxes containing copies of Flair; a box containing 200 applications for membership in the Flair Club; 20 catalogs listing items for sale in Flair; a mailing list of over 20,000 names; 9 manila envelopes containing pictures of members of the Flair Club and a directory of its members; a Flair Enterprises checkbook; photographs, negatives, drawings and illustrations and other paraphernalia used in the publication of Flair; two filing cabinets and a file drawer containing about 2,000 names and addresses and 4,500 pieces of correspondence; a large quantity of photographs of defendant, some in various stages of nudity, in poses with other males and females; 200 photographs with accompanying stories and a roll of eight millimeter film.
The contents of a storage room on the second floor were also removed, consisting of seven cartons of unopened mail, *109 a large number of forms, blank invoices and catalogs for Flair, a quantity of correspondence addressed to defendant Von Cleef, a "pile" of correspondence addressed to persons with certain code numbers appearing in Flair, invoices, a series of letters addressed to defendant and 15 drawings.
From a room on the third floor called the "tower" were removed the black object which had been described as a "torture box," a large quantity of red rubber garments, various types of chains, paddles, whips, straps, straight-jackets and padded clothing, various types of belts and other restraining devices taken from a dresser drawer, and two photo albums containing more pictures of defendant. Also taken from the tower room was a set of handcuffs attached to lengths of chain fastened to the ceiling and from another small room on the third floor were removed leather and rubber garments and other paraphernalia. In addition, the officers seized a large quantity of magazines and books.
Defendants' motion to suppress was denied and a considerable number of these items were introduced into evidence and described and commented upon by several witnesses during the trial.
In addition to the testimony of Detective Magnusson, testimony was developed from Postal Inspector Kallies as to the investigation of the publication of Flair and the defendants' connection with it. Various officers who participated in the arrest of defendants gave essentially corroborative testimony as to the circumstances of the arrest and the events leading up to it. In addition, the State produced Dr. Chernus, a qualified psychiatrist, who testified that many of the publications seized and introduced into evidence were patently offensive because they affronted contemporary community standards, appealed to the prurient interest of those to which they were directed and were utterly without redeeming social value. Even the defense's expert, Dr. Caprio, although obviously more liberal in his views than Dr. Chernus, acknowledged that some of the printed materials seized were obscene.
*110 The following questions are presented on this appeal and will be considered in the order advanced by defendants:
(1) Was the search and seizure conducted following the arrest of defendants unconstitutional?
(2) Did the State prove violations of N.J.S. 2A:115-1 (lewdness) and N.J.S. 2A:133-2(b) (occupying a building for purposes of lewdness or assignation)?
(3) Are the publications found on the premises obscene so as to warrant defendants' convictions for violation of N.J.S. 2A:115-2?

I
Defendants contend first that the search of defendant Von Cleef's home and the seizure of her papers and books was unconstitutional because made without a search or arrest warrant and not incidental to a valid arrest. They urge further, that even if the arrests were valid, the search which was made was exploratory and beyond the permissible scope of a search incidental to a valid arrest.
We note that although Detective Magnusson had in his possession at the time he arrested defendants two arrest warrants, these were held to be invalid by the trial judge at the hearing on the motion to suppress. Nevertheless, he ruled that the search was proper because it followed a lawful arrest which was based upon Magnusson's having reasonable grounds to believe an offense punishable by imprisonment for more than one year, namely, uttering an obscene publication in violation of N.J.S. 2A:115-2, was being committed. Much of defendants' brief is devoted to an attack on the basic premise of this ruling of the trial judge. The essence of defendants' argument in this respect is that probable cause involving a violation of an obscenity statute cannot be ascertained by a law enforcement officer alone; rather, a judicial determination is said to be required. See Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), and State v. Parisi, 76 N.J. Super. 115 (Cty. Ct. 1962).
*111 We find no necessity for determining the correctness of the trial judge's ruling in this respect because we are satisfied that under the circumstances in this case there existed adequate cause for belief that other offenses punishable by more than one year in prison were being committed by defendants. See State v. Doyle, 42 N.J. 334, 348-349 (1964). The facts known to the officer at the time of the arrest, including Miss Von Cleef's representations as to her past experiences and intentions with regard to Magnusson's "treatment," in our view clearly provided probable cause for believing that defendant Von Cleef was knowingly occupying her premises for purposes of lewdness or assignation, in violation of N.J.S. 2A:133-2. Additionally, these facts reasonably justified the belief that defendants were conspiring to maintain the premises for the purpose of lewdness and to commit acts of lewdness in violation of N.J.S. 2A:98-1, 2A:133-2 and 2A:115-1.
Let us briefly review the totality of those facts known to the police when the arrests and resultant search were made. During the course of an obscenity investigation in which Magnusson had been collaborating with the United States Post Office officials, Detective Magnusson had received a copy of the Flair and La Plume publications which he knew catered and were designed to appeal to persons "who were masochistic." Magnusson had been assigned for eight years to the special investigation division dealing with obscenity. He had had considerable training in the field of pornography, with special emphasis on sexual aberrations, including those dealing with homosexuality, transvestism, voyeurism, sadism and masochism. He had participated in almost 600 obscenity investigations. Magnusson knew that a James Beard had signed for the post office box in New York for Flair. The New York postal authorities had called his attention to the coded advertisement which appeared in La Plume accompanying the photograph said to be Monique Von Cleef. His telephone call after receipt of the letter from "Superior Monique" to TS confirmed the fact that the person advertising in La *112 Plume and defendant Von Cleef were one and the same. He knew that she had agreed to perform an act of sadomasochism. Everything that followed his entry into the building at 850 Lake Street confirmed that agreement or plan. Indeed, it was almost certain that a criminal act would have been completed had the prearranged raid not interrupted the activities.
As our Supreme Court has noted, the specialized training and experience of police officers must be taken into account in assessing the propriety of their actions in ferreting out furtive and ingenious activities. See State v. Contursi, 44 N.J. 422, 431 (1965). Even more so is this true of police experts. Considering Detective Lieutenant Magnusson's experience in the field of pornography and sexual aberrations, taken in conjunction with the facts known to him at the time of the arrest, we are wholly satisfied that there existed a sufficient basis for a finding of probable cause. We hold, therefore, that the arrests were valid.
Since the arrests were valid, we have no difficulty in concluding that the search and seizure of the various articles produced at the trial were incidental to the arrests and were within permissible limits.
The general rule in cases of this kind is quite clear: "[T]he premises where the arrest was made, which premises were under the control of the person arrested and where the crime was being committed, [are] subject to search without a search warrant." United States v. Rabinowitz, 339 U.S. 56, 61, 70 S.Ct. 430, 433, 94 L.Ed. 653, 658 (1950). The test is always whether the search was reasonable. Id., 339 U.S., at p. 66, 70 S.Ct., at p. 435, 94 L.Ed., at p. 660.
In the present case the search was extensive, but under the circumstances it was reasonable. The premises were owned by Miss Von Cleef and the items searched for and seized related to the criminal operation for which the arrest had been made. On these facts, where the crime alleged involved a vast business enterprise using the entire premises owned and controlled by the person arrested, such a search *113 must be deemed valid. See State v. Doyle, 42 N.J. 334, 344 (1964); Annotation, 4 L.Ed.2d 1982 (1960).

II
The essence of defendants' second contention is that "an act of punishment when committed by two consenting adults in private is not rendered criminal" by N.J.S. 2A:115-1 or 2A:133-2(b). As a result, it is argued, defendants' convictions for conspiring to commit acts of lewdness, in violation of N.J.S. 2A:115-1 and for maintaining premises for the purposes of lewdness, in violation of N.J.S. 2A:133-2(b), cannot be sustained.
N.J.S. 2A:115-1 provides:
"Any person who commits open lewdness or a notorious act of public indecency, grossly scandalous and tending to debauch the morals and manners of the people, or in private commits an act of lewdness or carnal indecency with another, grossly scandalous and tending to debauch the morals and manners of the people, is guilty of a misdemeanor."
The statute delineates two separate offenses: (1) public lewdness and (2) private lewdness. In this case conspiracy to commit only private lewdness was charged under this provision of the statute. Under N.J.S. 2A:133-2(b) defendants were also charged with permitting and conspiring to permit defendant Von Cleef's premises to be used for purposes of lewdness and assignation.
Certain general principles may be stated by way of introduction. "Lewdness" has been defined as "the irregular indulgence of lust, whether public or private." State v. Baldino, 11 N.J. Super. 158, 162 (App. Div. 1951). Public lewdness was a common-law crime requiring commission of the act in a public place; if the act was committed in private, the common law did not reach it. See Schoudel v. State, 57 N.J.L. 209, 210 (Sup. Ct. 1894). Prior to 1906, New Jersey's criminal statutes simply restated the common law as to public lewdness; there was no provision designed to *114 prohibit lewd acts performed in private. But in 1906 the statute was amended to include those acts committed in private with another person. See State v. Brenner, 132 N.J.L. 607, 610 (E. & A. 1945); State v. Michalis, 99 N.J.L. 31, 33 (Sup. Ct. 1923).
In light of the common-law and legislative background of N.J.S. 2A:115-1, therefore, it would appear that the statute means precisely what it says; i.e., "Any person who * * * in private commits an act of lewdness * * * with another, grossly scandalous and tending to debauch the morals and manners of the people, is guilty of a misdemeanor." As the plain language suggests, the elements of the offense are the commission of a lewd act in private with another person which act tends to debauch the public morals.
Nevertheless, defendants attempt to inject an additional requirement into the offense, namely, that the lewd act be witnessed by one who is not a participant and whose morals are debauched thereby. Defendants would read the statute as if "with another" meant "in the presence of another who is a nonparticipant." This construction is untenable; the statute explicitly applies to an accused who "commits an act of lewdness * * * with another." It obviously includes participants. Nor are we persuaded that the clause "grossly scandalous and tending to debauch the morals and manners of the people" adds weight to the argument that the presence of a third person is requisite to charge the statutory offense. The purpose of this language is merely to characterize the gross nature of the offense.
Defendants' claim that the statute has never been applied to a situation in which the participants witnessed the act is erroneous. In State v. Michalis, supra, defendant was convicted for private lewdness committed "with James Drake." No mention of a nonparticipating witness appears in the opinion.
Neither State v. White, 129 N.J.L. 200 (Sup. Ct. 1942), affirmed on opinion below 130 N.J.L. 527 (E. & A. 1943), nor State v. Brenner, supra, lend support to defendants' contention. *115 In White the court was called upon to determine whether an indictment alleging that defendant "[w]as in private guilty of an act of lewdness * * * by engaging in certain acts and practices so obscene and indecent that a minute description of the same would be offensive to the Court * * * wherefore a fuller description of the same is not set forth," effectively charged the commission of a crime. It simply held that the indictment was defective for failing to include, as required by the statute, an allegation that the act had also been committed "with another." The cryptic opinion of the court fails to define the key phrase "with another." We do not read White to require the presence of more than the participants to constitute the statutory offense. Similarly, in Brennan the court held that adultery and fornication committed in private between two consenting adults did not violate the statute because, and only because, adultery and fornication were not lewd acts if committed in private. Defendants' reliance upon these cases is, therefor, misplaced.
On the other hand, the clear language of the statute and its history militate in favor of its applicability to the present case.
Defendants' contention that an act of punishment by two consenting adults in private is not rendered criminal by N.J.S. 2A:133-2(b) is even weaker than their similar argument with respect to N.J.S. 2A:115-1. N.J.S. 2A:133-2 provides, in pertinent part:
"Any person who:

* * * * * * * *
b. Occupies any place, structure, [or] building * * * for the purpose of * * * lewdness or assignation, or permits any place, structure [or] building * * * owned or controlled by him to be used for such purpose, with * * * reasonable cause to know that the same is, or is to be, used for such purpose * * *

* * * * * * * *
Is guilty of a misdemeanor."
This statute does not contain the phrase "with another" nor does it define the terms "lewdness" or "assignation." The *116 argument that N.J.S. 2A:133-2(b) depends for its definition of "lewdness" upon N.J.S. 2A:115-1 is untenable for the latter statute likewise contains no definition of that term. Instead, as we have seen, "lewdness" has been defined by our case law as "the irregular indulgence of lust, whether public or private." "Assignation" means "`an appointment of time and place for meeting or interview;  used chiefly of love interviews and now commonly in a bad sense.'" State v. Baldino, supra.
The proof was plenary on both charges. The evidence as to what transpired up to the time the officers came upon the scene in Miss Von Cleef's parlor, if believed, alone fully supported the conspiracy charges and went far down the path towards proving the others.
Magnusson described sadism as the "inflicting of pain on another human being for sexual gratification, either degradation or corporal flagellation," and masochism as the "sexual gratification to the receiving of pain and degradation and humiliation." The performance about to be completed by defendant when she was interrupted by the raiding officers certainly involved elements of sadism and masochism, or sadomasochism, as the two terms are sometimes used together. It hardly requires argument that the act involved was of a lewd character measured by any acceptable definition. Even Dr. Caprio, the psychiatrist who testified on behalf of defendants, acknowledged that an act of flagellation on a stranger which is taken to the point of achieving an orgasm usually must be considered as a lewd act.
The evidence also justified the jury in concluding that this was not simply an isolated erotic episode on the part of defendant Von Cleef, but was representative of other acts of perversion being carried on by these defendants at the premises as a part of a far-flung commercial enterprise. We now turn to a brief review of that evidence.
There was testimony on the part of Inspector Dolan, who was assigned in New York to investigate obscenity materials going through the mails, that his office started an investigation *117 of the Flair publication as early as April 1965. His investigation disclosed that Albert J. Beard, as president of Flair Enterprises, had applied on November 12, 1964 for a post office box at the Murray Hill Station, describing Flair as a mail forwarding service magazine club. Defendant Von Cleef had obtained Box No. 158 in her name at the Lenox Hill Station in January 1965, and 850 Lake Street in Newark had been given as a forwarding address for that box in October 1965.
Flair Enterprises also made application to First National City Bank to open a checking account. This application recited the concern's business as "Magazine Flair." It was signed by Beard as owner. Filed with it was a power of attorney from him designating one M.B. Moore as his attorney authorized to deposit, draw and make checks with respect to the business transacted through that bank. Defendants' attorney stipulated at the trial that Monique Von Cleef, also known as Marianna Von Cleef, was Maria B. Moore and was the same person named in the power of attorney.
Detective Magnusson explained the mechanics of an operation like Flair or La Plume:
"* * * [T]hey buy what is referred to commonly as a sucker list. * * *
Now what he does is put out his little brochures. Once he is established in business and he mails them to individuals, this is the way the club is perpetrated and goes on and on and enlarges.
Now, any of the individuals receiving a solicitation from this are invited to scan the publications. They are offered to put an ad in here for a price, and they are given a code number to insure that it is very discreet and confidential. Then, if they wish to reply to any of the ads in this particular publication, they must forward a letter in a plain envelope, using the code number somewhere on the envelope. They put this envelope in another envelope and seal it up, put a stamp on it, and it has to be sent to the operator of this club.
The operator of this club then will open the original envelope, take out the one that is marked for whatever code number is represented on it, and then he will, in turn, forward them on.

* * * * * * * *
Once the operator of this gets the transmission, let's say, from an individual who answered an ad here, he will send it on to that *118 individual, and now these two people are in direct contact where they actually no longer need the services of this publication. But it has been our experience that these people not only contact others; they put an ad in themselves and then start to receive mail. So it just starts to keep growing and growing and growing. It's an expanding operation. It's one of the biggest things going on in this country today."
Produced before the jury were hundreds of application forms of individuals seeking to join the Flair Club, along with a ringed notebook containing a master file of names and addresses of correspondents from many states, sometimes accompanied by photographs. Alongside the names of some of the individuals were notations as to prices and the sexual activity in which the correspondent had evidenced interest. Making the records complete were filing cabinets containing filing cards constituting the basic record of the individuals with whom contact was made.
In addition, there was a large quantity of letters from various individuals addressed to "Monique" and "Mistress Monique," which Magnusson testified were "solicitations for various types of sexual activity," in some cases detailing minutely in four-letter language the natural and perverted acts referred to. Samples of these letters were read to the jury. Included among these was a series of letters from the individual whose letter sparked the investigation, some addressed to "Mistress Monique" and some to other persons, and in some cases mentioning advertisements appearing in Flair. These letters, written in a special vernacular commonly understood by sadomasochists, leave little doubt as to the character of the activities contemplated. The writer on numerous occasions refers to himself as a "slave" and expresses a wish to do anything his "mistress" or "queen" desires. One of the less offensive will serve as an example:
"Let me introduce myself  * * * very docile  friendly submissive to all.
I am interested in all things of the bizarre  bondage  forceful restraint  chastisement  photography  My first love is "French devotion" (females only).
*119 I have had some experience in the above.

* * * * * * * *
Also an amateur transvestite  (black nylon lace (sheer) lingerie). Will pose for polaroid shots with single or several females.

* * * * * * * *
Also exhibited to the jury and marked in evidence were the tools of this exotic trade: chains used as restraining devices, including one bearing a legend on the metal face, "Slave Samuel. Property of Monique."; several dildos; a leather paddle; a straight jacket; various types of belts; padded clothes and other devices. Detective Magnusson explained the significance of these items and also described the use of the "torture box" found on the premises. In addition, 18 photographs were introduced into evidence picturing defendant Von Cleef in various stages of nudity, brandishing a whip, apparently in the process of administering "discipline" to male or female participants restrained by chains or other bondage.
Finally, there were marked in evidence a series of books found on the premises as the result of the search, the titles of which sufficiently indicate their nature: Buttock Fetishism, Whip and Lash (by "Will Beatum"), Bound and Transformed, The Autobiography of a Flea, It's Delightful, The 120 Days of Sodom (by the Marquis DeSade), Lady Susan's Cruel Lover, Skirted Man, Teenage Discipline, Hermaphrodite in Silks, Dominant Female, and Spankers Monthly.
The foregoing is merely a brief summary of some of the salient evidence described in the 1,000-page record of the trial. Coupled with the proof of defendants' activities as described by various witnesses, it established beyond question the existence of a system of commercial exploitation of people with sadomasochistic sexual aberrations. It far transcends the situation which appellants would characterize as a simple act involving two consenting adults performed in private. Rather, the record reveals a wide system of solicitation and evidence from which a jury could reasonably infer that lewd acts were performed on the premises for profit.

*120 III
Finally defendants claim that their convictions for possession of obscene publications with intent to utter and expose them to the view of others in violation of N.J.S. 2A:115-2 cannot be sustained. They argue: (1) Spankers Monthly is not obscene; (2) other publications found on the premises were not properly in issue, and (3) the trial court abused its discretion in refusing to grant a continuance to permit defendants to call another expert witness.
Preliminarily, it is necessary to establish a framework for dealing with the first two contentions. The Supreme Court has established three elements which must coalesce in order for a publication to be adjudged obscene:
"(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex: (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General, 383 U.S. 413, 418, 86 S.Ct. 975, 977, 16 L.Ed.2d 1, 6 (1966).
Where the material is designed for and directed toward a clearly defined deviant sexual group, the prurient appeal test is satisfied if the material taken as a whole appeals to the prurient interest of that deviant group. Mishkin v. State of New York, 383 U.S. 502, 508, 86 S.Ct. 958, 16 L.Ed.2d 56, 62 (1966). In close cases, evidence that the material was promoted by assertions of its appeal to prurient interests may be probative. Ginzburg v. United States, 383 U.S. 463, 474-475, 86 S.Ct. 942, 16 L.Ed.2d 31, 40 (1966).
New Jersey decisions involving N.J.S. 2A:115-2 have also established that mere possession of obscene material without an intent to utter or expose it to the view of others does not violate the statute. See State v. Kohler, 40 N.J. Super. 600, 604-605 (App. Div. 1956). Moreover, proof that defendant was aware of the contents of the material in *121 his possession, commonly referred to as scienter, is indispensable to a conviction. See State v. Hudson County News Co., 41 N.J. 247, 257 (1963); State v. Hudson County News Co., 35 N.J. 284, 294 (1961).
Turning now to defendants' first argument, that Spankers Monthly is not obscene, it is readily apparent that the publication satisfies the three elements necessary to establish obscenity. The State's expert, Dr. Chernus, so testified at the trial. It was described as having a dominant appeal to the prurient interests of sadomasochists, being patently offensive to contemporary community standards, and being utterly without redeeming social value. Defendants' expert, Dr. Caprio, testified to the contrary. Based upon the evidence presented, however, the jury could reasonably conclude that Spankers Monthly is obscene.
The fact that a jury reached such a conclusion does not preclude this court from making an independent examination of the publication; indeed, it has a duty to do so. See Jacobellis v. State of Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964). Our independent examination of this publication convinces us that it is not entitled to protection under the First and Fourteenth Amendments.
Nor can it be argued that defendants did not possess Spankers Monthly with intent to utter or expose it to the view of others. The publication was, in fact, given to Detective Magnusson by defendant Von Cleef. Moreover, her statement to Magnusson that he should read Spankers Monthly because it would excite him negates any claim that she was unaware of its contents. This comment by Miss Von Cleef would appear to be probative also on the question of the magazine's appeal to prurient interests under Ginzburg v. United States, supra.
Contrary to defendants' contention, there is no requirement that a trial judge admit into evidence publications adjudged not obscene for purposes of comparison with those in issue. To so hold would obviously result in the introduction of collateral issues making the trial unmanageably complex. *122 Such matters seem better left to the discretion of the trial court in accordance with Rule 4 of the New Jersey Rules of Evidence. One court has already adopted a similar approach. See Books, Inc. v. United States, 358 F.2d 935, 939 (1 Cir. 1966), reversed per curiam on other grounds 388 U.S. 449, 87 S.Ct. 2098, 18 L.Ed.2d 1311 (1967).
Defendants' argument that other publications found on the premises were not properly at issue in the present case is devoid of merit. The elements of the offense claimed by defendant to have been absent, namely scienter and an intent to utter or expose them in the view of another, were plainly supplied by permissible inference. Considering the nature of the business defendants were in, the "services" they rendered, and the use to which Spankers Monthly was put in the presence of Detective Magnusson, it was certainly inferable that defendants knew the contents of the other books and intended to use them as they did Spankers Monthly. Since both experts testified that some of these other publications were obscene according to constitutional standards, the evidence at trial and an independent examination of them supports the jury's finding and the obscenity convictions on this ground also.
Defendants also argue that the trial judge erred in refusing to continue the case for another day to enable them to call another expert witness. This was a matter for the discretion of the trial judge. There was no abuse of discretion.
Affirmed.