THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. ARTHUR BRENNER AND NELLIE CATHERINE CANDERLIERE, PLAINTIFFS IN ERROR.

Submitted May 26, 1944—Decided March 16, 1945.

For the plaintiffs in error, *Aaron Van Poznak*.

For the state, *William A. Wachenfeld*, Prosecutor of the Pleas; *Donal C. Fox*, First Assistant Prosecutor, and *C. William Caruso*, Special Assistant.

The opinion of the court was delivered by

HEHER, J. The basic question here is the sufficiency *vel non* of the evidence to sustain the conviction of plaintiffs in

error, in the Essex Special Sessions, upon an indictment charging that on August 30th, 1942, they "were in private guilty of an act of lewdness with one another, grossly scandalous and tending to debauch the morals and the manners of the people and [of] indulging in certain other acts and practices so obscene and indecent that a minute description of the same would be offensive to the court and improper to be placed on the record thereof, wherefore a fuller description of the same is not set forth herein, * * *."

The Supreme Court affirmed the judgment; and the accused thereupon sued out a writ of error from this court. The entire record of the proceedings had upon the trial was returned with the writ of error issued out of the Supreme Court, pursuant to *R. S.* 2:195–16.

It is assigned for error, among others, that the sessions judge, at the close of the case, denied a motion for a judgment of acquittal for lack of evidence, and also that the "verdict" was against the weight of the evidence under *R. S.* 2:195–19. The appellants must prevail.

The evidence reasonably tended to show only that the accused were guilty of fornication. It was proved that on August 29th, 1942, at about 11:30 P. M., they entered Brenner's three-room suite in an apartment house in East Orange. At approximately 3 A. M. on the following morning, Brenner's wife, her nephew, James J. Thomas, Jr., the latter's wife, Mary, his father, James J., Sr., and a police officer entered the darkened apartment (with the aid of a flashlight) via the fire escape and a window raised by one of them (there was then but one "small light" in the living room, into which the window opened), and found Brenner in the hallway at the bedroom door, "struggling to get on a pair of pajamas," and Canderliere lying in bed under a cover, clothed in a nightdress. Mrs. Brenner drew the cover from her. There was testimony also as to observations purportedly made by Mrs. Brenner and her kinsfolk from the roof of a building nearby, one-half hour after the accused had entered Brenner's apartment. Thomas, Jr., said that he saw the accused "undress and go to bed." We have no means of knowing whether the sessions judge credited this particular

piece of evidence. If he did, his finding in this regard was contrary to the great weight of the evidence. Without suggesting that what was thus related is of itself determinative of the issue, we are clear it was purely imaginative. The witness admitted that his view of the apartment was from an elevated position some sixty-five or seventy feet away, and that the bedroom window shades were half-way down. Although there were no lights in the bedroom, and there was a hall between the bathroom and the bedroom, he insisted the "reflection" of a light in the bathroom gave him "a very good view of the bedroom." But Mrs. Brenner testified that, while she saw Canderliere in the bedroom attired in a nightgown, she did not see her husband at all. She did say, however, that she left the roof to procure cigarettes for her nephew, and did not resume observations upon her return. Mary Thomas merely said that she saw the accused "walking around in the room, and after a while the light went off." Later, she admitted that she "couldn't see simply because" her father-in-law and her husband "were really taking up the room;" she "had just a glimpse." Thomas, Sr., did not take the witness stand; it was explained that he was suffering from a "heart ailment," but there was no showing that he was thereby incapacitated as a witness.

Neither adultery nor fornication, committed in secret and not constituting cohabitation publicly indecent in the manner of the association, is lewdness within the intendment of our law. Originally, the Crimes Act condemned only "open lewdness, or any notorious act of public indecency, grossly scandalous, and tending to debauch the morals and manners of the people." *Pamph. L.* 1898, *pp.* 794, 808; *Comp. Stat.* 1910, *p.* 1762. This was merely declaratory of the common law. In that system, "lewdness" signifies open and public indecency and is punishable as a common nuisance, injurious to public morals; and it is therefore essential that the lewd act be committed in a public place, and be seen by persons lawfully in that place. Private or secret indecency is not criminal, since the common law does not deem such offensive to the public morality. *Schoudel* v. *State,* 57 *N. J. L.* 209; 1 *Bishop on Criminal Law* (*9th ed.*), §§ 235, *et seq.,* §§ 500,

*et seq.* Indecent exposure in the presence of but one person, although in a place of public resort, no others being able to see it at the time, has been held not to be a common nuisance and therefore not an indictable offense at common law. *Regina* v. *Watson,* 2 *Cox C. C.* 376; *Regina* v. *Webb,* 1 *Denison* 338; 1 *Bishop on Criminal Law (9th ed.),* § 244. But there are cases declaring that the place is public if the act is such as that it is likely to be seen by a number of casual observers. *Regina* v. *Farrell,* 9 *Cox C. C.* 446; *Van Houten* v. *State,* 46 *N. J. L.* 16.

In 1906, the cited provision of the Crimes Act relating to lewdness was amended to include within that criminal category persons "who shall in private be guilty of any act of lewdness or carnal indecency with another, grossly scandalous and tending to debauch the morals and manners of the people." *Pamph. L.* 1906, *p.* 101; *R. S.* 2:140-1. Considered in the light of the old law, this provision was evidently designed to encompass, as also appropriate for the animadversion of the criminal law, those acts of lewdness and carnal indecency which, by reason of the secrecy attending their commission, were not within the interdiction of the pre-existing law.

Lewdness, within the concept of the statute, imports some degree of sexual aberration or impurity. It denotes gross and wanton indecency in the sexual relations. Blackstone defines "open and notorious lewdness" at common law as "some grossly scandalous and public indecency." 4 *Blk. Com.* 64. Neither adultery nor fornication is a criminal offense at common law, unless by the manner of its commission it constitutes a public nuisance. *State* v. *Lash,* 16 *N. J. L.* 380; 4 *Blk. Com.* 64; 1 *Am. Jur.* 683. As used in a statute rendering "open" lewdness criminal, the term has been defined as "the irregular indulgence of lust, whether public or private." *Commonwealth* v. *Wardell,* 128 *Mass.* 52. The amendment of 1906, *supra,* has reference to grossly scandalous lascivious acts and behavior, in private, tending to debauch the morals and manners of the people. Plainly, this category does not comprehend either adultery or fornication, for these transgressions against chastity and sexual

decency had long since been denounced as misdemeanors; and there is no suggestion of a purpose thus to reclassify them. *Pamph. L.* 1898, *pp.* 794, 807; *R. S.* 1937, 2:106–1, 2:133–1. See, also, *Rev. Stat.* 1877, *p.* 234; *Gen. Stat.* 1895, *p.* 1057. It has long been the legislative policy to deal with adultery, fornication, and lewdness by companion provisions under the general head of crimes against public morals and the institution of marriage. We do not entertain the view, seemingly expressed by the Supreme Court in *State* v. *Michalis*, 99 *N. J. L.* 31, that if the act in question has a tendency to debauch the morals and manners of the people when committed in public, then it is lewdness within the intendment of the statute when done in private. We doubt that the learned writer of the opinion in that case intended to state the statutory rule in the absolute. What he said must be considered with reference to the particular circumstances.

A penal statute is to be read in relation to the evil or mischief to be suppressed. While its terms are to be given effect in accordance with their fair and natural acceptation, they cannot be extended by implication or intendment. Enactments of this class are on well-settled principles to be strictly construed against the state. *State* v. *Lash, supra; State* v. *Waxman,* 93 *N. J. L.* 27. Acts not clearly within the prohibited class are excluded. General terms are restrained by the obvious sense and purpose of the statute. And here the term "lewdness" is to be assayed in the light of its common-law meaning, bearing in mind also the rule that statutes in derogation of the common law are subject to a strict construction. It is not a question of morals, but one of law; and the legislative expression must be interpreted by the principles of the common law.

The judgment is accordingly reversed, and a *venire de novo* awarded.

*For affirmance*—None.

*For reversal*—The Chancellor, Parker, Case, Donges, Heher, Perskie, Porter, Wells, Rafferty, Thompson, Dill, JJ. 11.