85 N.J. Super. 240 (1964)
204 A.2d 379
STATE OF NEW JERSEY, BOROUGH OF EAST PATERSON, BOARD OF HEALTH, PLAINTIFF-RESPONDENT,
v.
ELMWOOD TERRACE, INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 13, 1964.
Decided October 23, 1964.
*242 Before Judges CONFORD, KILKENNY and LEWIS.
Mr. Sylvan G. Rothenberg argued the cause for appellant.
Mr. Salvatore R. Scillieri argued the cause for respondent.
The opinion of the court was delivered by KILKENNY, J.A.D.
Defendant, owner of a 296-unit garden-type apartment house complex in East Paterson, Bergen County, was found guilty in the municipal court of violating the borough heating ordinance on March 14, 1963, by failing to maintain on that date the required minimum temperature of 68° Fahrenheit in 17 of the apartments in this housing project. The complaints contained 17 counts, one for each apartment not properly heated. The magistrate fined defendant $100 on each count, for a total of $1,700.
On defendant's appeal to the Bergen County Court there was a plenary trial de novo and defendant was again found guilty. The same fine was imposed. Defendant has taken this appeal from the judgment of the County Court.

I.
Defendant's first contention is that there was a failure of proof of violation of the ordinance.
*243 The ordinance, so far as pertinent here, provides:
"Section 1. It shall be the duty of every * * * corporation who shall have contracted or undertaken, or who shall be bound to heat or to furnish heat for any building or part thereof, occupied as a home or place of residence * * *, to heat or to furnish heat for every occupied room in such building or part thereof, so that a minimum temperature of 68 degrees Fahrenheit shall be maintained therein at all times * * *.
Section 2. Any * * * corporation violating * * * this Ordinance upon conviction thereof shall be subject to a fine of up to $100 * * *. Each day that a violation shall exist or continue shall constitute a separate and distinct offense."
On March 14, 1963, about 8:15 A.M., the borough health inspector received telephone calls at his home from tenants in defendant's apartment houses, complaining that they didn't have any heat in their apartments. The health inspector went immediately to the apartments and took temperature readings in each of the apartments in question, finding in each case a reading of less than 68° Fahrenheit. The highest inside reading was 65° Fahrenheit. The lowest was 58° . The outside temperature was 37° . He took the apartment temperature readings in what he deemed to be the coldest part of each apartment, because some of the tenants were trying to keep warm by wearing sweaters or jackets and by keeping their kitchen gas ranges lit. Thus, the health inspector took his readings in a bedroom or living room rather than in the warmer kitchen. In each instance, he checked all the radiators and found them "cold." He observed that all the windows were closed. Based upon his findings, the health inspector made his 17-count complaints, charging violations of the borough heating ordinance.
The health inspector had received a telephone call about 8 P.M. on the preceding evening, March 13, 1963, from the president of defendant corporation, advising him that something had happened to boiler No. 3  which supplies heat to all the apartments involved in the violations charged  that there had been an internal fire in this boiler, causing it to be shut off Defendant's president testified that he advised the health inspector *244 that he had called the service people to make the necessary repairs, if possible, through the night but, if not, to be there first thing in the morning of March 14.
The repairs were not begun until about 7 A.M. on March 14, and about 4:30 P.M. that day the boiler and oil-burning unit were in operation. However, No. 6 oil was used and this cheaper grade of fuel oil requires preheating and operation of the boiler and burner for some time before there are a "good fire" and sufficient temperature. As a result, "it was dark" when the last two men in the service group left the premises.
One of the servicemen who had made the repairs testified that there had been a carbon build-up in front of the burner, that this caused a fire in the chamber of the boiler itself, and the excessive heat from the fire in the boiler caused damage to the burner and its consequent shutting off. The wiring in the burner was damaged and a rewiring was required. The fan, the cup and the front plate were all warped. The damaged parts were replaced, and it was necessary to do some inside chamber work in order to get the burner in operation. The trial judge inquired of this witness as to what he meant by "a carbon buildup" and he answered:
"Well, with this No. 6 oil, it impinges on anything that is in direct line of fire and then it gradually just builds up and builds up upon itself."
He reiterated that this process goes on "gradually."
An expert witness, called by defendant, testified:
"With bunker oil as they are using in this case, which is an extremely heavy oil, well, actually what happens, there would be a build-up of carbon and the oil  this carbon deposit would catch fire. It's a common thing with this type of oil."
Asked whether this carbon build-up could be detected in advance, he answered:
"It can and it can't. It is the type of thing with No. 6 oil, if the draft isn't just proper for, let us say, an hour's time, there can be a *245 build-up of this carbon or oil deposit within an hour. It also could be that this thing could have occurred over a period of a year, if nobody had inspected the burner."
This expert stated that an inspection would disclose the presence of the carbon build-up, "unless the man who made the inspection was completely inept." But he noted the possibility of a carbon build-up within an hour after an inspection, if the draft wasn't proper.
Defendant's president had testified that this particular boiler was inspected on March 13, 1963 before the fire. However, he did not call as a witness the person who made the inspection. If the carbon build-up was there at the time of the inspection and the inspector did not observe it, then the inspection was "completely inept," as defendant's expert described such conduct. If the carbon build-up had been seen and a "let's forget it" attitude was adopted, then "this would be criminal," according to defendant's own expert. If the carbon build-up were not present at the time of inspection, but developed in a relatively short time thereafter, then there was inferably carelessness in regulating the draft, or some similar neglect on the part of defendant or its agents.
Under all the circumstances, and especially the testimony by defendant's own witnesses that this carbon build-up ordinarily happens "gradually" in the use of No. 6 oil, the County Court was justified from the evidence in finding that the failure of boiler No. 3 could have been averted by reasonable maintenance procedure. We concur in its fact finding that "the heat deficiency was the result of defendant's neglect."
Defendant argues that a temperature reading taken in the coldest room of each apartment, showing less than 68° Fahrenheit therein, was not sufficient to establish a violation of the ordinance. Reliance is placed upon Potter v. Weleck, 131 N.J.L. 155 (Sup. Ct. 1944). The ordinance in that case required the landlord to provide heat to a temperature of 68° Fahrenheit to the "building or any part thereof." The court there held that, if "any part" of the building be *246 heated to the required degree, there is no violation even if other parts are not so heated. We do not subscribe to that strained interpretation of the ordinance in that case. In any event, we are clear that the sensible construction of the ordinance before us is that there is a violation if any part of any occupied room is of a lower temperature than that specified. Moreover, since the ordinance expressly requires the landlord "to furnish heat for every occupied room" in the building, it was sufficient to sustain the conviction to establish that the required heat was not furnished in any one of the occupied rooms of an apartment, regardless of the temperature in other rooms of the same apartment or other parts of the building. In accord herewith, see Newark v. Charlton Holding Co., 9 N.J. Super. 433, 441 (Cty. Ct. 1950).

II.
Defendant argues that the ordinance violates the due process provision of the Fourteenth Amendment to the United States Constitution by its imposition of criminal sanctions without the requirement of fault. We have indicated above that liability can here be sustained even on the premise of a prerequisite in the ordinance of fault or neglect.
But even if the ordinance is construed not to require a showing of fault, it is not necessarily invalid for that reason and certainly should not so be held in the context of this case.
While it is axiomatic that the Legislature may render an act criminal without the requirement of guilty knowledge or wrongful intent, United States v. Greenbaum, 138 F.2d 437, 152 A.L.R. 751 (3 Cir. 1943); State v. DeMeo, 20 N.J. 1 (1955), "it is not within the competency of the law-giver to render that criminal which in its very nature is innocent and essentially nonculpable * * *. Some act of commission or omission lies at the foundation of every crime." State v. Labato, 7 N.J. 137, 148 (1951). At the same time, as was noted in State v. Chiarello, 69 N.J. Super. 479, 494 (App. Div. 1961), certification denied 36 N.J. 301 *247 (1962), "a wide variety of social and economic problems has impelled the adoption in this century of numerous `strict liability' penal statutes by both Congress and state legislatures * * *." The Pure Food and Drugs Act is a notable example thereof. Violations thereof result in penal sanctions, regardless of moral culpability.
This same issue was raised by the defendant in Newark v. Charlton Holding Co., supra, where the heating ordinance was similar to that herein. The court there upheld the constitutionality of the ordinance, noting that "even though the ordinance is not dependent upon the proof of defendant's intent, it is clear that defendant by the exercise of due care can always protect itself from conviction of such a violation." 9 N.J. Super., at p. 440. Defendant attempts to distinguish Newark v. Charlton Holding Co. from the instant case on the ground that there was proof of a lack of due care in the former and no proof of neglect herein. As noted above, that purported distinction lacks support in the record. We are not called upon herein to determine whether defendant would be excused from compliance with the ordinance in the event of some unpredictable Act of God. Here we have the ordinary case of failure to keep the heating apparatus under defendant's control in proper working order, resulting in its break-down and the violation.

III.
Defendant's final claim of error is that the fines totaling $1,700 imposed by the court below are excessive under the circumstances herein, in violation of Amendment VIII of the United States Constitution and Article I, paragraph 12 of the New Jersey Constitution, which provide that "excessive fines shall not be imposed."
Defendant argues that since all 17 apartments were heated by a single boiler and burner, there was only a single act of dereliction on its part, if any, in its failure to avoid a break-down of that boiler and burner on the day in issue. It is therefore contended that there was but one violation of the ordinance, *248 even though 17 apartments were cumulatively affected by this single offense. On the basis of this premise, defendant maintains that the fine should not have exceeded $100 under the terms of the ordinance. In defendant's view, multiple fines were imposed for but a single offense, thus contravening the constitutional prohibition against "excessive fines," or, alternatively argued, subjecting it to double jeopardy.
Whether this contention by defendant has substantial merit depends in the first instance on whether defendant was guilty of only a single violation or 17 violations of the ordinance when it failed to furnish the required heat to the 17 apartments on March 14, 1963. Obviously, if there was but a single violation, the fine would be limited by the terms of the ordinance to a maximum of $100. If there were 17 violations, the propriety of the fine must be viewed in the light of the penalty imposed for each separate offense. A fine of $100 for violation of a municipal ordinance is not excessive. Montclair v. Stanoyevich, 6 N.J. 479, 483 (1951). N.J.S.A. 40:49-5 provides that the governing body may prescribe penalties for violations of ordinances, including a fine not exceeding $200.
A defendant may not generally be subjected to double or multiple punishment for the same offense. United States v. Noble, 155 F.2d 315, 318 (3 Cir. 1946). But the same conduct may furnish the basis for separate charges for which separate punishments may be imposed. "To determine whether the offenses are the same the test is whether each count requires proof of a fact which the others do not." Ibid. For example, if an unlicensed operator of a motor vehicle drove his car at an excessive rate of speed through a red light while intoxicated, this single act might furnish the basis for separate charges against him for which separate punishments might be imposed. Each count would require proof of a fact which the others do not.
Compare State v. Pennsylvania Railroad Co., 9 N.J. 194, 195 (1952), where it was held that only one criminal offense of manslaughter could be charged as the result of a disastrous railroad accident in which 84 lives were lost because, concededly, *249 "the same facts would be put in evidence to prove each offense," with State v. Hoag, 21 N.J. 496 (1956), affirmed 356 U.S. 464, 78 S.Ct. 829, 2 L.Ed.2d 913 (1958), holding that, where four persons in a bar were relieved of their valuables and money during the same holdup, the acquittal of defendant on earlier indictments charging armed robbery of three of the persons would not preclude prosecution of defendant on an indictment charging him with armed robbery of the fourth person. The "same evidence" rule was held inapplicable in Hoag because the evidence needed to support the robbery of one victim would not have been sufficient to secure conviction for robbery of the other victims, inasmuch as the indictment "charged a forcible taking of different property from * * * different individuals." 21 N.J., at p. 502.
In the instant case the evidence necessary to establish defendant's guilt on any one of the 17 counts was different from the evidence required to prove any of the other counts. The temperature reading, chilly condition and cold radiators in one apartment, with all the windows thereof closed, would not have been sufficient to secure conviction for failure to furnish the required heat in the other apartments covered by the other counts of the complaints. As in Hoag, the basic objective conduct of the defendant is the same, the happening was at the same time and under the same circumstances, but there were multiple victims and separate proofs were required as to each. Accordingly, we conclude that defendant was guilty of separate violations in breaching its duty to each of the 17 tenants in their respective apartments, being under a contractual obligation with each of these tenants to furnish heat for each apartment, and the ordinance imposing a penally enforcible duty as to each occupied room with respect to which there was a civil duty to supply heat. Defendant's use of a common boiler for the 17 apartments, rather than a separate one for each, to fulfill its several obligations did not make its default unitary in character.
In Newark v. Charlton Holding Co., supra, defendant was thrice convicted of violating the heating ordinance in failing *250 to furnish the required heat to three adjoining business premises owned by it, all being heated by the same oil heating plant operated by defendant. The convictions were affirmed. On the other hand, in People v. Horn, 282 App. Div. 956, 125 N.Y.S.2d 725, 727 (App. Div. 1953), two informations were lodged against defendant landlord by two separate tenants in the same apartment building for failure to provide the required heat during the same period. The proceedings were consolidated and resulted in the conviction of defendant, with two separate fines being imposed. On appeal, one of the fines was set aside as being double punishment for a single act, the court noting that the "proceedings were consolidated and the obligation and omission of the landlord as to each tenant were the same." The Horn case is noted herein to indicate that there is some authority supporting defendant's view. However, we do not subscribe to its rationale, especially since the opinion does not make manifest the language of the regulatory provision, or whether the obligation to the tenants was joint or several.
Defendant interprets the boiler break-down as the offense for which it was prosecuted. On the contrary, as we see it, the gravamen of the offense was its failure to furnish the required heat to each individual occupied living space. The break-down of the boiler was rather its common defense to the 17 charges made against it. In the example above of the unlicensed driver who commits several offenses by the same act, such an accused might rely upon a common defense, such as insanity, to exculpate himself from the charges made. In Hoag the defendant relied upon the common defense of alibi. But the assertion of a single common defense to several charges does not convert otherwise separate violations into a single offense.
If, as we have concluded, the intent of the ordinance was to constitute a separate offense for each occupied living space not furnished the specified degree of heat, we should be loathe to conclude that the municipality lacked constitutional power to so ordain. To confine the power to punish, even for repetitive *251 violations, to the concept of a single offense and a single fine, no matter how many apartments were left unheated by the boiler break-down, would emasculate the ordinance as a penal deterrent, especially in relation to large realty operators as to whom a single $100 fine would have only a nominal impact. It was conceded by defendant at the argument that it had been previously convicted of violation of the same ordinance.
The imposition of maximum fines of $100 on each of the 17 counts seems at first blush to be unduly harsh, considering all of the circumstances herein. But we are loathe to interfere with the discretion vested in trial courts to fix the amount of the penalty, so long as the penalty is within the statutory or ordinance limits. The trial judge's closer familiarity with the background of the case usually makes him better equipped to mete out a punishment which will serve as an adequate deterrent in the future. The prior conviction of this defendant for violation of this ordinance, noted above, may very well have induced the lack of leniency in the penalties imposed. Proper judicial restraint at the appellate level precludes our modification of the quantum of the fines.
The convictions and penalties imposed are affirmed.