IN THE MATTER OF THE SUSPENSION OR REVOCATION OF
THE LICENSE OF PETER T. DeMARCO, M.D., TO PRACTICE
MEDICINE AND SURGERY IN THE STATE OF NEW JERSEY.

Argued January 22, 1980—Decided June 2, 1980.

26

---

*Bertram P. Goltz, Jr.,* Deputy Attorney General, argued the cause for appellant Board of Medical Examiners (*John J. Degnan,* Attorney General of New Jersey, attorney; *Erminie L. Conley,* Assistant Attorney General, of counsel).

*John Montis* argued the cause for respondent Peter T. DeMarco, M.D.

The opinion of the Court was delivered by

WILENTZ, C. J.

The sole issue before us is whether a statute which penalizes offenses by physicians was intended to result in a penalty totaling $200 for all offenses, no matter how many or how different, before a first conviction is obtained, or $200 for *each* such offense. Put differently, the sole issue is whether *N.J.S.A.* 45:9–22 authorizes the State Board of Medical Examiners (the Board) to impose multiple penalties upon an initial finding of multiple violations. We hold that it does.

The primary charge against respondent was that he caused 92 cases of hepatitis among his patients by using improperly sterilized needles and syringes. The Assistant Commissioner of Health described this as the largest outbreak of hepatitis ever associated with a single physician's practice in the entire world.

The needles and syringes were used to inject the patients with Procaine PVP (PVP), a drug developed and patented by DeMarco. He prescribed and administered PVP for a variety of diseases, conditions and ailments, including vascular problems, strokes, heart diseases, arthritis, multiple sclerosis, lupus, slipped disc, gangrene, depression, Parkinson's disease, kidney problems, psoriasis, tic douleureux, diabetes, dermatitis, failing vision, ulcers, bullet wounds, headaches and menopause. He also administered it prophylactically, apparently as a general health measure. He had sought approval of the drug from the United States Food and Drug Administration (FDA), but the FDA rescinded the temporary authorization it had granted DeMarco to test PVP in 1965, because of concern over the drug's reported carcinogenic qualities. Nevertheless DeMarco continued to use the drug. His practice became almost exclusively one of administering intramuscular injections of PVP. Almost invariably, he would prescribe ten daily injections to be followed by an indeterminate course of bi-weekly injections.

In 1968, the Board ordered him to cease and desist the use of PVP, describing it as "a potentially dangerous drug that may be

medically and scientifically unsafe." The Board did not enforce this order, however, and DeMarco continued his injections. He used non-disposable, resterilized needles and syringes. Although most present-day doctors prefer to avoid potential sterilization problems by using disposable needles and syringes (at a unit cost of three or four cents), proper sterilization of reusable needles and syringes is easily possible. An investigator for the Board testified, however, to seeing brownish incrustations on DeMarco's needles and syringes. He also noted that the tray used to hold this equipment was too large to fit in DeMarco's autoclave (a sterilizing device), that the autoclave was not regularly tested for efficacious sterilization, that the needles and syringes were left lying about unwrapped after having been autoclaved, and that needles and syringes tested after sterilization showed bacterial growth indicating contamination. DeMarco used the same syringe and even the same needle on numbers of patients without sterilization between uses. To give an injection, at the period surrounding the hepatitis outbreak, he would fill a syringe from a large bottle of Procaine PVP through a tube and needle which remained attached to the bottle. Upon removing the filled syringe, he would attach a needle and inject the patient. He was not, as one of his patients testified, "a man for washing his hands." Thus, infection could have been transmitted by contamination of the bottle of Procaine PVP from the used syringe, or could have been passed from one patient to another on an unsterilized or improperly sterilized syringe or needle.

In July 1976, a number of cases of hepatitis among DeMarco's patients were reported by other physicians to the New Jersey Department of Health. Although all physicians are required to make such reports, DeMarco never reported a case of hepatitis and in fact told at least one patient that PVP would take care of his hepatitis. As a result of the spate of hepatitis reports, the Board obtained an order from the Commissioner of Health that DeMarco cease and desist using needles and syringes for any

purpose and make his equipment, inventory and records available for inspection. On August 26, 1976, the Board suspended DeMarco's license to practice medicine and surgery in New Jersey pending a hearing.[1]

The hearing was on a complaint seeking penalties and revocation of DeMarco's license. It began in March 1977 and spanned several months. The hearing examiner concluded that DeMarco was guilty of gross malpractice and gross neglect in the practice of medicine which had endangered the health and lives of patients, in violation of N.J.S.A. 45:9–16, and had been causally associated with the deaths of two of his patients.

The hearing officer recommended that DeMarco's license be revoked[2] but that no civil monetary penalties be imposed. On January 13, 1978, the Board, finding that DeMarco had caused the 92 reported cases of hepatitis among his patients by using improperly sterilized needles and syringes, permanently revoked DeMarco's license and imposed a penalty of $20,200. This penalty reflected $200 penalties for each of the 92 cases of

---

[1]DeMarco relocated his practice to Pennsylvania where he continued to administer PVP to his patients. The Pennsylvania State Board of Medical Education and Licensure revoked his license on May 24, 1978. The Commonwealth affirmed that revocation on December 4, 1979. *Peter T. DeMarco v. Commonwealth of Pennsylvania, State Board of Medical Education and Licensure*, 47 Pa.Cmwlth. 500, 408 A.2d 572. DeMarco filed a petition for allowance of appeal with the Supreme Court of Pennsylvania on December 7, 1979. The petition is pending, and the revocation order has been stayed throughout the proceedings.

[2]*N.J.S.A.* 45:9–16, a broad regulatory statute, provides:
   The board may refuse to grant or may suspend or revoke a license or the registration of a certificate or diploma to practice medicine and surgery or chiropractic filed in the office of any county clerk in this State under any act of the Legislature, upon proof to the satisfaction of the board that the holder of such license . . . (h) has been guilty of gross malpractice or gross neglect in the practice of medicine which has endangered the health or life of any person . . . .

hepatitis, totaling $18,400, and $1,800 reflecting other counts in the complaint against DeMarco.[3] On DeMarco's appeal the Appellate Division affirmed the permanent license revocation, but reduced the penalty from $20,200 to $200. Since the present proceedings were the first ever initiated against DeMarco, the court concluded that such amount was the maximum that could be imposed under the "first offense" language of *N.J.S.A.* 45:9–22, which provides:

> Any person . . . who violates any of the provisions of this chapter or any supplement thereto, shall be liable to a penalty of two hundred dollars ($200.00), for the first offense. . . .

We denied DeMarco's petition for certification, in which he sought review of the license revocation, but granted the Board's petition in order to review the Appellate Division's modification of the penalty imposed. 81 *N.J.* 355 (1979). For the reasons stated herein, we reverse and reinstate the penalty imposed by the Board of Medical Examiners.

Our construction of the statute is based on the clear legislative intent to deter and punish physicians who would risk the health and lives of patients through gross malpractice. To construe it so as to impose a total penalty of $200 for 92 life-threatening violations would be to drain it of all strength.

That the Legislature has a deep interest in the regulation of that profession which protects life and health is obvious, as is its similar interest in insuring compliance with the regulatory statute through various deterrent provisions. The statutory framework reflects this intent through both regulatory and disciplinary provisions, including the power given to the Board to revoke a physician's license. *See, e. g., N.J.S.A.* 45:9–1 through –3; 45:9–16, –22, –23, –26 and –27.4. This power to revoke is

---

[3]At oral argument, the question of how many counts were reflected in this portion of the penalty was not pressed. The parties agreed that the issue was whether the appropriate penalty was $200 or $20,200.

complemented by the power to impose penalties for any violation of the chapter, and there is no indication, nor any reason to believe, that penalties were intended to be any less important as a deterrent than the possibility of revocation.

The statutory provisions concerning penalties begin with *N.J. S.A.* 45:9–22. That section subjects a physician who violates "*any* of the provisions" of the chapter to a penalty of $200 "for the first offense." If after conviction, he is again convicted of "another violation" of the chapter or of continuing the first violation for which he was previously convicted, the penalty becomes $500. *N.J.S.A.* 45:9–26. If there is still "another violation," or if he continues the original violation, the penalty is $1,000. *Id.* The legislative language is perfectly suited to the situation of a physician who violates the act on three separate occasions over a period of time. Once convicted of his first violation and fined $200, the physician is on notice that his next violation will result in a stiffer penalty ($500) and that each violation thereafter will bring an even heavier fine ($1,000). The statutory scheme, in this typical situation, will achieve both punishment and deterrence: the repeating offender is punished more harshly with each offense and the non-offender deterred by knowledge that any offense will lead to an increase in potential penal liability.

This language, however, is less apt where multiple violations, whether related or not, occur *before* the first conviction. The $500 penalty (*N.J.S.A.* 45:9–26) is authorized when there has been a prior conviction. The language is as follows:

> In case a person shall, after conviction of any violation of this chapter or any supplement thereto, be again convicted of another violation thereof . . . such offender shall be liable to a penalty of $500 . . . .

That the $500 penalty is inapplicable to any violation not preceded by a conviction is so clear as to admit of no other construction. Respondent, however, contends that not only is a $500

penalty prohibited for any violation which precedes the first conviction, but that *all* violations, no matter how many, prior to the first conviction can result in only one fine of $200 for all of them lumped together, rather than $200 each. He points to the language which imposes a penalty of $200 "for the first offense" and argues that the Legislature could never have intended the linguistic absurdity of someone being guilty of more than one "first offense." That absurdity, he says, would exist if a $200 fine authorized for the "first offense" resulted in the imposition on one physician of a $2,000 fine arising from ten separate violations, all preceding any conviction, penalized at $200 each— the equivalent of ten separate "first offenses." That being the case, he continues, all of those violations together must result in but one "first offense" and a total fine of $200.

There are many responses to this argument, the primary one being the clear subversion of the legislative intent implicit in such construction. The language of the statute, however, is not as simple as respondent argues, and similar absurdities result from respondent's construction. It may be difficult to swallow the notion that there can be more than one "first offense," but it is even more difficult to believe that 92 violations over an extended period add up to but one "first offense."

An examination of the statute reveals not the slightest support for respondent's contention. There is a $200 fine if one "violates *any* of the provisions of this chapter," $500 for "another violation thereof" or for "continuing *the* violation" which led to the first fine, and $1,000 for yet "another violation" of the act. After reaching the $1,000 penalty level (after two convictions), again the statute speaks in terms of further $1,000 fines for subsequent convictions of "any violation" of the act. Not only is nothing said here about a "$200 fine for the first conviction," but the section containing the $200 penalty includes the following language: "The *penalties* provided for by this section shall be sued for and recovered by and in the name of

the State Board of Medical Examiners of New Jersey . . ."
(Emphasis added). This language suggests potential liability for
more than one $200 penalty upon the first conviction, since it is
applicable *only* to violations that occur before the first convic-
tion. None of this language accords with an interpretation that
would impose one $200 fine for an aggregate of any number of
violations. A construction that would impose but one $200 fine
upon the first conviction, regardless of the number of violations
on which that conviction is based, and one $500 fine for the
second conviction, regardless of the number of violations on
which that latter conviction is based, and one $1,000 fine for the
next conviction regardless of the number of violations on which
it is based, amounts to a conclusion that the Legislature wanted
to deter convictions not violations.[4]

It is further argued that imposing a $200 penalty for each
violation ignores the fact that when the Legislature intended
such result it knew how to say that unambiguously. *See, e. g.,*
the various statutes cited in *In re Wolfe,* 160 *N.J.Super.* 114,
120–21 (App.Div.1978), as well as *N.J.S.A.* 45:9–22.1, –55, 45:9B–
14, each of which uses language imposing penalties "for each
offense." All of these statutes either were passed at different
times or cover different subjects from the provision before us.

---

[4]The dissent, which would penalize the physician $200 in the *actual* case
before this Court on account of 92 life-threatening violations, while the Court
would impose a penalty of $18,400, suggests, *see infra* at 42, that if the
reasoning of the Court (as apparently understood by the dissent) were applied
to a hypothetical case *not* before us at all, an absurdly low penalty would
result. This is the hypothetical situation of a "continuing violation," after an
assumed first conviction as to *each* of the 92 individual victims. The dissent
concludes that we would find a $500 penalty appropriate. While the hypo-
thetical may suggest many interesting questions, definitive answers to which
need not be attempted here, it seems rather clear that the approach taken by
the *dissent* would result in one $500 fine in the aggregate for all 92 continuing
violations while the majority's approach would result in a fine of $46,000, or
$500 for each continuing violation.

They do not raise the kind of question that might be presented if the very section, chapter or act under construction contained such contrasting language elsewhere when the "first offense" provision was initially adopted. Furthermore, in practically every statute containing this contrasting "for each offense" language, that language itself is superfluous: even without it, under ordinary rules of statutory construction each separate violation would result in the penalty provided regardless of whether there were separate convictions or various offenses subsumed under one conviction. Additionally, the subject of violations, offenses, convictions and penalties therefor is so widely covered throughout our statutes with differing patterns of language, often having absolutely no difference in meanings, that to ascribe such a difference in meaning in this case (despite the overriding purpose of achieving deterrence against violations) would be to ascribe heavy significance to what, at best, is really very sparse evidence.

The preferred response, of course, would be to point to a statute concerning a similar subject matter passed at around the same time which says "upon first conviction hereunder there shall be a penalty of $200 *in toto*, no matter how many or how serious the separate violations included in that conviction may be." The argument would continue that "when the Legislature wanted to achieve *that* result, it knew how to say it." We have found no such statute passed at that time concerning the practice of medicine or some related field. Moreover, we have not found any such statute passed at any time covering any matter even remotely suggesting such a strange result.

Accordingly, we construe the provision in question to impose a separate $200 penalty for each and every violation, whether the violation is asserted alone or along with others as the basis for a conviction; stepped-up separate penalties apply

only where there has been a prior conviction. Respondent's construction of the statute is not only less persuasive but totally ignores the deterrent purpose of the provision.

Our construction of the provision, we believe, is supported by subsequent legislation. On July 13, 1978, the Uniform Enforcement Act became effective.[5] *L.*1978, *c.* 73. Under this act, all licensing boards are expressly authorized to revoke, suspend or refuse to renew professional or occupational licenses for stated grounds, *N.J.S.A.* 45:1–21, and to impose penalties and sanctions, *N.J.S.A.* 45:1–22. As to the imposition of penalties, section 12 of the act (*N.J.S.A.* 45:1–25) provides:

> Any person violating any provision of an act or regulation administered by a board shall, in addition to any other sanctions provided herein, be liable to a civil penalty of not more than $2,500.00 for the first offense and not more than $5,000.00 for the second and each subsequent offense. For the purpose of construing this section, each transaction or statutory violation shall constitute a separate offense; provided, however, a second or subsequent offense shall not be deemed to exist unless an administrative or court order has been entered in a prior, separate and independent proceeding. . . .

While this direction that each violation prior to the first conviction shall result in a separate penalty could again be used as an argument that "when the Legislature wanted to say it it knew how to do it," we believe that it simply clarifies and continues to reflect the prior legislative intent. More than that, the highly

---

[5]A repealer, *L.*1979, *c.* 432, effective February 14, 1980, specifically repealed *N.J.S.A.* 45:9–26, among numerous other sections governing professional regulation, but did not mention *N.J.S.A.* 45:9–22, the section at issue in this case. We note, although the question is not specifically before us, that notwithstanding this probably inadvertent omission, the Uniform Enforcement Act may have superseded if not impliedly repealed section 45:9–22. *See generally 1A A. D. Sutherland, Statutory Construction,* §§ 23.09, 23.11, 23.13 (4th ed., Sands, 1972).

increased penalties substantially confirm the overriding deterrent purpose of the penalty section.[6]

Respondent contends that, there being some question about that construction of the statute which results in $200 penalties for each violation, he is entitled to have us construe it so as to result in a total of one $200 penalty since it is a penal statute, and therefore to be strictly construed. *See, e. g., Castellon v. Hudson County Treasurer*, 145 *N.J.Super.* 134, 137–38 (App.Div. 1976), certif. den. *sub nom. Castellon v. Greenan*, 74 *N.J.* 263 (1977) (civil penalty for violation of lottery laws); *State Bd. of Medical Examiners v. Warren Hosp.*, 102 *N.J.Super.* 407, 413–14 (Cty.Ct.1968), aff'd o.b., 104 *N.J.Super.* 409 (App.Div.), certif. den., 54 *N.J.* 100, 253 *A.*2d 548 (1969) (prohibition against hospital employment of out-of-state licensed physicians). *See generally 3 A. D. Sutherland, Statutory Construction*, § 59.03 at 6–13 (4th ed., Sands, 1974).

■ The rule that penal statutes are to be strictly construed has at its heart the requirement of due process. No one shall be punished for a crime unless both that crime and its punishment are clearly set forth in positive law. It does not invariably follow, however, that every time someone can create an argument as to the meaning of a penal sanction, the statute is impermissibly vague, or that the lowest penalty arguably applicable must be imposed. Numerous cases have rejected this approach. *State v. Parmigiani*, 65 *N.J.* 154 (1974), aff'g *State v. Angelo's Motor Sales*, 125 *N.J.Super.* 200 (App.Div.1973); *State*

---

[6]Under the predecessor statute, if two independent violations occurred prior to any conviction, it is arguable that the Board could have prosecuted each independently and that conviction on the second violation, if preceded by conviction on the first, would have resulted in a stepped-up penalty. Though not crystal clear, the new statute seems to foreclose such a result.

Neither statute addresses the question whether repeated similar acts of gross malpractice against one patient constitute one or more violations. *Cf. In re Wolfe*, 160 *N.J.Super.* 114 (App.Div.1978).

*v. Gill,* 47 *N.J.* 441 (1966); *State v. Provenzano,* 34 *N.J.* 318 (1961); *State v. Gratale Bros., Inc.,* 26 *N.J.Super.* 581 (1953).

The question ultimately is one of fairness, given the statute and its provisions, and given the situation of the defendant. Should he have understood that his conduct was proscribed, should he have understood that the penalty about to be imposed was the sanction intended by the Legislature? The test is whether the statute gives a person of ordinary intelligence fair notice that his conduct is forbidden and punishable by certain penalties. That test, however, does not consist of a linguistic analysis conducted in a vacuum. It includes not simply the language of the provision itself, but related provisions as well, and especially the reality to which the provision is to be applied. The test here is whether a *physician* of ordinary intelligence would have understood, and would have been given fair notice by virtue of these provisions, that his conduct rendered him liable to a $200 penalty as to each patient.

A physician of ordinary intelligence would have to understand that the Legislature intended to prohibit violations of the act, intended to prohibit any act of gross malpractice that might threaten the life or health of a patient. A physician of ordinary intelligence would have to understand that the penalties provided in the act were intended to deter each and every such violation. A physician of ordinary intelligence could not possibly conclude that having committed one violation which would render him liable to a $200 penalty he was free thereafter to commit as many violations of any kind whatsoever as he pleased without being subject to any further penalty. If anyone had suggested to him that that is what the statute meant, he would have responded that no legislature could possibly have intended such a result. His only doubt would have been whether he was liable to a $500 penalty for his second violation and $1,000 penalties for each one after that. Such doubt as to the possibility of even higher penalties does not relieve him of liability for

the clearly applicable lesser ones. In short, never could he believe that having committed gross malpractice and neglect and having threatened the life of one patient, thereby subjecting himself to liability for a $200 penalty, the law would allow him to subject the lives of 91 other patients to a similar threat without imposing any additional penalty whatsoever.

We note that our holding is in accord with the only other case dealing with this matter, although it is not clear that the issue was projected there. In *In re Wolfe*, 160 *N.J.Super.* 114 (App. Div.1978), the Appellate Division imposed five $200 fines on account of what it held to be five separate violations under the act, there having been no prior conviction.[7] It is also in accord with the Appellate Division's reasoning in *State v. Elmwood Terrace, Inc.*, 85 *N.J.Super.* 240 (App.Div.1964). There, a penal ordinance applied to certain corporations which had undertaken to "furnish heat for any building or part thereof, occupied as a home or place of residence." It required them to heat or furnish heat for every occupied room in such building or part thereof so that a minimum temperature of 68 degrees Fahrenheit would be maintained therein at all times. The Appellate Division reasoned:

---

[7]The dissent correctly notes that *In re Wolfe* held that the statute (*N.J.S.A.* 45:9–22) did not authorize *daily* penalties for a continuing violation. That issue is not involved here at all. The significance of *In re Wolfe* to this matter is that in that case five separate offenses occurring before any conviction were each treated under the very same statute as is involved here (*N.J.S.A.* 45:9–22) as a "first offense" resulting in a fine of $1,000, rather than $200, which latter fine is what the dissent would have imposed in that case. As the Court there said, referring to these five violations:

> Each of these violations constitutes a separate and distinct offense. Each qualifies as a "first offense" for purposes of the penalties authorized.

> We therefore vacate the monetary penalties assessed by the Board against appellant, and in the exercise of our original jurisdiction . . . assess a penalty of $200 for each violation of the statute, for a total penalty of $1,000. [160 *N.J.Super.* at 122].

[T]he intent of the ordinance was to constitute a separate offense for each occupied living space not furnished the specified degree of heat . . . . To confine the power to punish, even for repetitive violations, to the concept of a single offense and a single fine, no matter how many apartments were left unheated by boiler break-down, would emasculate the ordinance as a penal deterrent, especially in relation to large realty operators as to whom a single $100 fine would have only a nominal impact. [*Id.* at 250–51].

The improbability that a single penalty would serve as a deterrent in this case is highlighted by its facts. DeMarco's practice consisted almost entirely of PVP injections. He did not examine his patients; they told him their problems, sometimes based on the diagnosis of another physician, sometimes not. Whatever the disease or condition complained of, DeMarco would advise a standard course of ten daily PVP injections followed by two injections per week, continuing for as long as the patient cared to continue. DeMarco spent an average of three to four minutes with each patient. The average cost to the patient was $10 per injection. Given the assembly-line nature of the practice, it is hardly likely as an economic matter that a single $200 penalty would have any deterrent impact at all.

Admittedly, the Board's power to revoke a physician's license is a more potent deterrent than its power to impose penalties. Respondent suggests this as a justification for his construction of the penalty provision. The argument apparently is that to render practically ineffective that which was initially weak does not conflict with the Legislature's intent. Suffice it to say that there is absolutely no indication that the Legislature intended to relegate monetary penalties to some kind of second class status, to be whittled away by judicial construction because not really needed in the first place. Explanations of the need for this complementary and equally important additional deterrent include the rather obvious one that in certain cases the Board may not wish to impose suspension or revocation but may very much want to deter violations. The ability to impose penalties meets this need. Ultimately, however, the importance of penalties lies

in the total deterrent effect of the availability to the Board of the combination of both kinds of sanctions.

Accordingly, that portion of the Appellate Division judgment which modified the statutory penalties is reversed and the full penalty imposed by the Board of Medical Examiners is reinstated.

SCHREIBER, J., dissenting.

When interpreting statutory language, courts must remain cognizant at all times of the principle that a criminal offense does not exist without an explicit law. This derives from the classic thought, *nullum crimen sine lege*, which is intrinsic in most enlightened legal systems. A criminal code prescribes the behavior pattern for individuals. What a person may or may not do should not depend on reflections and considerations not explicitly set forth in the code. An explicit law is one that is not susceptible to several reasonable interpretations.

These concepts have spawned some well known doctrines. Penal statutes should be strictly construed. See *State v. Carbone*, 38 *N.J.* 19, 24 (1962); *State v. Meinken*, 10 *N.J.* 348, 352 (1952). Crimes and their sanctions must be defined with appropriate definiteness. See *State v. Fair Lawn Service Center, Inc.*, 20 *N.J.* 468, 472 (1956). Terms of a statute should not be extended by implication or intendment. *State v. Brenner*, 132 *N.J.L.* 607, 611 (E. & A. 1945). Where more than one reasonable interpretation may be made, construction should be drawn against the State. "[I]n case of doubt concerning the severity of the penalty prescribed by a statute construction will favor a milder penalty over a harsher one." 3 *Sutherland, Statutory Construction* § 59.03 at 7 (4 ed. Sands 1974). Failure to give a person of ordinary intelligence fair notice that his conduct is forbidden by statute and punishable by certain penalties transgresses procedural due process. *State v. Smith*, 46 *N.J.* 510, 518–519 (1966); Annotation, "Indefiniteness of language as af-

fecting validity of criminal legislation or judicial definition of common-law crime," 16 *L.Ed.2d* 1231 (1967).

Keeping these principles in mind, I am constrained to find that neither Count V of the complaint nor the statute, *N.J.S.A.* 45:9–22,[1] justified the imposition of a fine of $18,400.

The complaint that was filed and served on Dr. DeMarco consisted of 12 counts. Count V charged that his conduct in causing at least 95 patients to contract hepatitis constituted gross malpractice or gross neglect endangering health and demonstrated that he was professionally incompetent to practice medicine. The conclusory paragraph in Count V charged that the respondent was guilty of gross malpractice and neglect and was not qualified to remain a licensed physician. The prayer for relief set forth at the conclusion of the 12 counts sought revocation of his license to practice medicine and surgery, assessment of "such penalties as may be required by law" and "such further relief as may be just and appropriate."

*N.J.S.A.* 45:9–22 provides that any person

> who violates any of the provisions of this chapter or any supplement thereto, shall be liable to a penalty of two hundred dollars ($200.00), for the first offense. Every person practicing medicine and/or surgery or chiropractic under a firm name and every person practicing medicine and/or surgery or chiropractic or as an employee of another shall cause his name to be conspicuously displayed and kept in a conspicuous place at the entrance of the place where such practice shall be conducted, and any person who shall neglect to cause his name to be displayed as herein required, shall be liable to a penalty of one hundred dollars ($100.00). The penalties provided for by this section shall be sued for and recovered by and in the name of the State Board of Medical Examiners of New Jersey, in a summary manner, pursuant to the Penalty Enforcement Law (N.J.S. 2A:58–1 et seq.) and the Rules of the Supreme Court. Process shall be either in the nature of a summons or warrant.

---

[1]This provision may have been repealed by *L.* 1978, *c.* 73, § 13, *N.J.S.A.* 45:1–26, and superseded by *L.* 1978, *c.* 73, § 12, *N.J.S.A.* 45:1–25.

*N.J.S.A.* 45:9–26 [2] adds that after a person has been convicted and is

again convicted of another violation thereof or of continuing the violation for which such offender was previously convicted, such offender shall be liable to a penalty of five hundred dollars ($500.00) . . . [and] after two convictions . . . such offender shall be liable to a penalty of one thousand dollars ($1,000.00) . . . . The penalty for each subsequent conviction of any violation of this chapter or this act, shall be one thousand dollars ($1,000.00).

These provisions should not be read in isolation. *N.J.S.A.* 45:9–22 should be construed in the light of *N.J.S.A.* 45:9–26.

The Appellate Division reasoned that "first offense" meant a "first offender" and therefore only one penalty of $200 could be assessed. This is a reasonable conclusion. A "first" offense contemplates that there may be a second. Yet, how would that construction apply to the 95 individuals of Count V? The majority's interpretation would mean that, if the 95 were improperly injected a second time prior to a first conviction, each of those occasions would also be a "first offense." Further, if the subsequent improper conduct occurred after this conviction, it would seem that the penalty would be limited to $500. Thus, there would be the incongruous situation of an $18,400 penalty for the first offense and a $500 penalty for precisely the same acts leading to a second conviction.

When the Legislature wanted to apply a separate penalty for each offense in Title 45, it did so. See, *e. g., N.J.S.A.* 45:9–22.1 ("for each offense"); *N.J.S.A.* 45:9–42.21 ("for each such offense"); *N.J.S.A.* 45:9–55 ("for each offense"); *N.J.S.A.* 45:9B–14 ("for each offense").[3] Furthermore, the Legislature has now seen fit to prescribe uniform standards for license revocation,

---

[2]This provision may have been repealed and superseded. See note 1.

[3]These provisions may have been repealed and superseded. See note 1.

suspension and other disciplinary proceedings to be applied by boards regulating various professionals such as accountants, architects, dentists, optometrists and doctors. *N.J.S.A.* 45:1–14 *et seq.* Under this act the penalty provision differentiates between a first and second offense, the maximum fine being $2,500 for the first offense and $5,000 for the second. *N.J.S.A.* 45:1–25. The statute significantly defines

> each transaction or statutory violation . . . [as] a separate offense; provided, however, a second or subsequent offense shall not be deemed to exist unless an administrative or court order has been entered in a prior, separate and independent proceeding. [*N.J.S.A.* 45:1–25]

Accordingly, a fair reading of *N.J.S.A.* 45:9–22 and *N.J.S.A.* 45:9–26 is to equate a first offense with a first conviction.

The majority reasons that the use of the word "penalties" in *N.J.S.A.* 45:9–22 suggests that the Legislature intended more than one $200 penalty could lawfully be assessed upon the first conviction. I respectfully disagree. The "penalties" referred to are the $200 for a first offense and the $100 penalty for failure to conspicuously display the doctor's name at his office entrance. See 83 *N.J.* at 32–33.

The proposition that the statutory language may only be interpreted as understood by a physician of ordinary intelligence is a novel approach that might under other circumstances have some merit. However, no medical expertise is needed to construe what is referred to in this statute. Even if the majority were correct, I hasten to add that the record is utterly devoid of any proof that a physician would have any different understanding of this act than a person of ordinary intelligence. Moreover, given the language of the act and the relative unimportance of any monetary penalty as compared to the loss of one's license to practice medicine, a doctor of ordinary intelligence could readily interpret the statute as the Appellate Division did.

At another point the majority implies that statutory intent is to be determined by legislative intent unexpressed in the language enacted or legislative history. Given the principle that in the absence of clear language construction should be drawn against the State, the majority's interpretation must fail because the Legislature did not expressly authorize more than a $200 fine for each violation. When the Legislature wanted to authorize more than one fine for a first offense it *did* so explicitly by revising the penalty provision to define "each transaction or statutory violation . . . [as] a separate offense." *N.J.S.A.* 45:1–25. It has not done so in this case.

The majority's reliance upon *In re Wolfe,* 160 *N.J.Super.* 114 (App.Div.1978), certif. den. 78 *N.J.* 406 (1978), and *State v. Elmwood Terrace, Inc.,* 85 *N.J.Super.* 240 (App.Div.1964), is misplaced. In *In re Wolfe,* Dr. Wolfe was charged with five different types of violations in five counts. One count alleged that he violated *N.J.S.A.* 45:9–16(g) by employing his wife to practice medicine and surgery. He had improperly employed her for 434 days and presumably she practiced on each of those days on different people. The Board assessed a penalty against him of $43,400 ($100 per violation). The Appellate Division, noting that *N.J.S.A.* 45:9–22 and 45:9–26 are to be strictly construed, held that the Board was restricted to imposing a penalty not to exceed $200 and modified the Board's order accordingly. So in the instant case the Appellate Division relying upon *In re Wolfe* held that the total maximum penalty for Counts 2, 5, 6, 7 and 9, constituting the same type of violation (gross malpractice, gross negligence and incompetence), could only be $200. It did *not* hold that DeMarco could not be fined $200 for each of the remaining six counts (3, 4, 8, 10, 11 and 12) which dealt with violations of a different nature, such as failure to comply with a State Medical Board order. Rather, it impliedly held that DeMarco's conduct did not constitute a violation of the statute as alleged in those six counts.

In *Elmwood Terrace*, a municipal ordinance required landlords to furnish heat at a prescribed minimum temperature in every room in the building. The ordinance provided for fines of up to $100 for violations, each day constituting a separate offense. The landlord violated the heating standard in 17 different apartments and was charged in 17 counts, one for each unit. The court, after commenting that the proofs for each apartment unit differed, held that there were 17 separate violations; the gravamen of the offense was failure to furnish the heat to each individual occupied living space. The ordinance involved was not at all comparable to the statutory provisions considered in this case.

The majority concedes that "[n]o one shall be punished for a crime unless both that crime and its punishment are clearly set forth in positive law." 83 *N.J.* at 36. (emphasis added). That is the key to the defect in the statute—which has now been rectified. The Court lays great stress on the overall design of the statute to protect the public. That design was substantially met when the license to practice medicine and surgery was revoked. Both the Hearing Examiner (former Justice Francis) and a unanimous Appellate Division seem to be of this opinion. I do not condone the heinous activities of the defendant and join fully in the Court's condemnation, so graphically described, of Dr. DeMarco's flagrant abuse of the use of his license as a physician. However, his egregious conduct does not justify transgression of well-established principles of criminal jurisprudence.

I would affirm the judgment of the Appellate Division.

Justice POLLOCK joins in this dissent.

*For reversal and reinstatement in part* —Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD and HANDLER—5.

*For affirmance* —Justices SCHREIBER and POLLOCK—2.