874 A.2d 568 (2005)
378 N.J. Super. 20
STATE of New Jersey, Plaintiff-Respondent,
v.
Stacey FROLAND a/k/a Stacey Kindt, Defendant-Appellant.
State of New Jersey, Plaintiff-Appellant,
v.
John Kindt, Jr., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 4, 2005.
Decided June 3, 2005.
*570 Mark A. Fury, argued the cause for appellant, Stacey Froland Kindt.
Barry J. Serebnick, Assistant Prosecutor, argued the cause for appellant, State of New Jersey (John Kaye, Monmouth County Prosecutor, attorney; Mr. Serebnick, of counsel; Christopher J. Decker, Legal Assistant, on the brief).
Daniel I. Bornstein, Deputy Attorney General, argued the cause for respondent, State of New Jersey (Peter C. Harvey, Attorney General, attorney; Mr. Bornstein, of counsel and on the brief).
Mark S. Guralnick, Cherry Hill, argued the cause for respondent, John Kindt, Jr.
Respondent John Kindt, Jr., filed a pro se brief.
Before Judges BRAITHWAITE, LISA and WINKELSTEIN.
The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
Defendants John Kindt (Kindt) and Stacey Froland Kindt (Froland) are husband and wife. Through a prior marriage, Kindt has two children; he shared custody of the children with their mother, Anne O'Connor (O'Connor), his ex-wife. Kindt and Froland were indicted for, among other offenses, first-degree kidnapping of the children, N.J.S.A. 2C:13-1b(4).
*571 The trial court severed Kindt's and Froland's cases.[1] Following a jury trial, Froland was convicted of multiple offenses, including first-degree kidnapping. She claims the kidnapping convictions must be reversed because she had the consent of the children's father, Kindt, to take the children. Her case is before us on direct appeal, where she raises the following points:
POINT I: DEFENDANT IS INNOCENT AS A MATTER OF LAW BECAUSE THE TAKING WAS NOT UNLAWFUL AS DEFINED IN N.J.S.A. 2C:13-1.
POINT II: THE PROSECUTION ABUSED ITS DISCRETION BY OVERCHARGING THE DEFENDANTS IN CONTRAVENTION OF THE SPIRIT OF THE STATUTE.
POINT III: THE PROSECUTOR'S ABUSE OF DISCRETION IS MADE MANIFEST BY THE IMPROPRIETY OF THE APPEARANCE OF HIS INTIMACY WITH A VICTIM.
POINT IV: THE VERDICT OF KIDNAPPING WAS AGAINST THE WEIGHT OF THE EVIDENCE.
POINT V: DEFENDANT'S IMPROPER CHARGE OF KIDNAPPING TAINTED THE JURY'S DELIBERATIONS ON THE CHARGE OF [INTERFERENCE] WITH CHILD CUSTODY.
Kindt's case has not yet gone to trial. He moved before the Law Division to dismiss the kidnapping charges, claiming the kidnapping statute does not apply to a parent with joint custody who abducts his children. On June 4, 2004, the Law Division judge agreed and dismissed the kidnapping charges against him. We granted the State leave to appeal from that order.
The predominant issue in each case is whether a parent with joint custody can be guilty of kidnapping his or her own child. We conclude that the kidnapping statute applies to such a parent. Accordingly, we affirm Froland's kidnapping conviction and reverse the order of the Law Division that dismissed the kidnapping charges against Kindt.

I.
We take the facts as they apply to Kindt from the Grand Jury proceedings of August 13, 2002. To the extent they differ, we take the facts as they apply to Froland from the evidence at her trial.
Kindt and O'Connor were married in New Jersey in 1985. They later moved to California where they adopted two children: J.K., born on September 1, 1994, and O.K., born on July 19, 1995. Around Thanksgiving 1996, O'Connor and Kindt separated; she moved back to New Jersey with the children to be near her family, and Kindt remained in California.
O'Connor sued Kindt for divorce in New Jersey; a final judgment was entered on May 1, 2000. The parties agreed to joint legal custody of the two children. O'Connor was the parent of primary residence and Kindt the parent of alternate residence. Kindt was to have "reasonable and liberal parenting time with the children" whenever he was able to come to New Jersey, which he frequently did. At times, he would spend two weeks in this State before returning to California; and the children occasionally went to California to visit him.
As part of the parenting arrangement, Kindt had physical custody of the children on alternate holidays. Kindt and O'Connor also agreed that if they resided in the same vicinity during a holiday, they would *572 share holiday time "so that the children [would] be with both parents on those days." Kindt could spend at least five weeks with the children each year, as long as the children were not separated from O'Connor for more than two weeks at a time.
Kindt married Froland in 2000. They rented a home in Brick, New Jersey, where they lived with Froland's young daughter S.F., who had been adopted by Kindt, and Kindt's eighteen-year-old nephew, Matthew Aronson.[2] After he moved to New Jersey, Kindt's parenting time was increased by agreement. O'Connor later obtained an order enforcing the agreed-upon parenting schedule.
In accordance with the parties' agreement, the children were with O'Connor on Christmas Day 2000. The following Wednesday morning, December 27, 2000, she dropped them off at Kindt's home, where they were to remain until Friday. The next morning, she returned to bring presents she had forgotten the day before.
Kindt and O'Connor agreed to meet Friday morning, at a doctor's appointment for J.K., to have the children returned to O'Connor. But, because the appointment was cancelled due to an impending snowstorm, on Thursday night O'Connor called Kindt to discuss alternate arrangements to have the children returned to her. O'Connor suggested that she pick up the children on Saturday, December 30, at 9:00 a.m.; but Kindt, after telling O'Connor to "hold on" while he conferred with Froland, told her to come at noon.
At approximately 6:30 p.m. on Friday, December 29, O'Connor called Kindt's home; the phone lines had been disconnected. She went to the Brick home twice that evening and found it to be deserted. After returning to the home the following day to pick up the children, and finding no one there, she went to the police and filed a missing children report.
The police investigation disclosed the following. On searching the Brick home, they located, among other things, three computers that had been stripped of their hard drives. They also located preprinted Federal Express air bills for letters or packages sent to: boat sales establishments in Rumson, New Jersey and Oriental, North Carolina; Passport Express Services, Inc.; and Froland's mother in Nevada.
On December 4, 2000, Kindt, under the pseudonym John Kaliczak, signed a contract to purchase a boat from Sandy Hook Yacht Sales in New Jersey. On December 13, Froland applied for a copy of her daughter's, S.F.'s, birth certificate. The next day, Froland, Aronson and S.F. received passports, with an intended destination of New Zealand. The date of travel was to be December 23, 2000. Kindt later obtained birth certificates for J.K. and O.K., and defendants requested and received medical records for the three children.
On December 27 or 28, 2000, defendants sent a package to Passport Express Services to obtain passports for J.K. and O.K., to travel to the United Kingdom on July 6, 2001. Froland withdrew over $50,000 from her accounts.
Both Kindt and Froland sent letters to their respective families, informing them that they had taken the children and intended to flee to a jurisdiction friendly to their position  that Kindt, as the children's father, should have more say in *573 their upbringing. They did not believe they would get a fair shake in New Jersey because O'Connor's father was a former county counsel and Froland and Kindt believed he exerted influence on the courts.
On Friday, December 29, Kindt and Aronson abandoned the family minivan at the Newark Airport in an effort to throw the police off their track, while Froland and the children waited for them at Penn Station in Newark. When Kindt and Aronson arrived at Penn Station, they all boarded an Amtrak train for North Carolina. Upon arrival, Kindt cancelled the contract to buy the boat in New Jersey, and instead purchased a thirty-nine-foot boat in North Carolina, the Dorado. Under the John Kaliczak pseudonym, he obtained insurance on the boat. He also purchased over $1600 in groceries and $1500 in boat supplies.
The morning of January 20, 2001, Kindt, Froland, Aronson, J.K., O.K. and S.F. set sail from Oriental, North Carolina. Two days later their boat became disabled. Kindt, Froland and Aronson were detained by the Coast Guard, and later arrested.
Armed with a search warrant, the police searched the Dorado. They found Froland's diary, which outlined in detail the events surrounding the abduction. Other items found on the boat included: birth certificates for Kindt, Aronson, J.K., O.K. and S.F.; credit cards issued to Froland and Kindt; passports for Froland, Aronson, and S.F.; a global positioning system and nautical chart kits for: the Bahamas, the intracoastal waterway from Norfolk to Florida, the east coast of Florida, the Florida Keys, and North Carolina; a Mid-Atlantic Waterway Guide for Chesapeake Bay to Florida; a Reed's Nautical Almanac; several books, including: "Cruising With Children," "Hide Your Assets and Disappear," and "How to be Invisible"; luggage full of clothing; children's books, videos and toys; waterproof flashlights and binoculars; walkie-talkies; and four computer hard drives.
From one of Kindt's home-computer hard drives, the police retrieved a "to do" list relating to the abduction, and copies of letters Kindt and Froland sent to their families. The letter from Froland to her mother stated that defendants were taking the children because "so long as the children are in [O'Connor's] possession and so long as her father runs Monmouth County, the law will protect her." Froland went on to say:
[W]e have decided that we only have two options: either leave the children, or take them.
Please know that it is not our intention to take [J.K.] and [O.K.] away from their mother. This would be just as wrong as what she did four years ago and continues to do every day. It is our intention to establish possession of the children, create a new status quo, and remove ourselves to somewhere far enough away that her father's influence will not be able to taint the judicial process. We believe very strongly that despite our differing value systems and differing opinions in virtually every aspect of childraising, that the children need their mother and should be afforded a relationship with her. However, we also believe very strongly (and the Bible supports us) that the father is the head of the household. He is held personally accountable to God for how his children turn out and is therefore responsible for all instruction, reproof, guidance, and discipline....
... This is not an escape, it is a rescue.
Please know that this was a very difficult decision for us to make and that it was not made in haste.
*574 Froland also asked her mother to destroy certain records so they could not be traced, and she set up a "safe" phone messaging system through Yahoo!.
Kindt's letter to his mother and father had a similar theme, stating, in part:
By the time you read this, [J.K.], [O.K.] and I will be gone.... But, it's now true. We are gone, somewhere, I can't tell you where.
....
[M]y priority must be these precious kids who the Lord has entrusted foremost to me. I know that I am complicit in where this awful situation has deteriorated.... But you also know of how my good intentions over the last few years have been so manipulated and abused, that it has come down to this:
Take them, or leave them.
I can not leave them. I simply can not leave them.

II.
In August 2002, Kindt, Froland and Aronson were indicted by a Monmouth County grand jury on two counts of first-degree kidnapping, N.J.S.A. 2C:13-1b (counts one and two); two counts of second-degree interference with custody, N.J.S.A. 2C:13-4a (counts three and four); fourth-degree contempt of court, N.J.S.A. 2C:29-9 (count five); two counts of third-degree attempted interference with custody, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:13-4a (counts six and seven); and second-degree conspiracy to kidnap, N.J.S.A. 2C:5-2, N.J.S.A. 2C:13-1b and N.J.S.A. 2C:13-4a (count eight).
Following a seven-day jury trial commencing on January 28, 2003, Froland was acquitted of counts six and seven, attempted interference with custody, and convicted on all remaining counts. For sentencing, the court reduced the first and second-degree offenses by one degree each, and imposed an aggregate seven-year term. Froland is currently on parole.

III.
Against this factual and procedural framework, we turn first to the order dismissing the kidnapping counts against Kindt. The issue for which leave to appeal was granted is whether Kindt, as a joint custodial parent of J.K. and O.K., may be charged with their kidnapping.[3]
Prior to 1999, New Jersey's kidnapping statute read, in pertinent part:
b. . . . A person is guilty of kidnapping if he unlawfully removes another from his place of residence ... or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period, with any of the following purposes:
(1) To facilitate commission of any crime or flight thereafter;
2) To inflict bodily injury on or to terrorize the victim or another; or
(3) To interfere with the performance of any governmental or political function.
[N.J.S.A. 2C:13-1b (1986) (amended 1999).]
The statute prior to 1999 and as amended, defines the term "unlawful" as it applies to a person's removal or confinement: "A removal or confinement is unlawful ... in the case of a person who is under the age of 14 ... if it is accomplished without the consent of a parent, guardian or other *575 person responsible for general supervision of his welfare." N.J.S.A. 2C:13-1d.
Because the kidnapping statute did not address a situation "where a person unlawfully takes a child intending to raise the child as the person's own," the Legislature amended it in 1999 to "close this loophole in the law by clarifying that the unlawful taking or confining of a child with the purpose of permanently depriving a parent or guardian of custody constitutes the crime of kidnapping." Assembly Judiciary Committee, Statement to S. 446, (March 25, 1999) (Committee Statement). To achieve this intent, the Legislature added the following subsection to N.J.S.A. 2C:13-1b:
(4) To permanently deprive a parent, guardian or other lawful custodian of custody of the victim.
[N.J.S.A. 2C:13-1b(4).]
Thus, the amended statute now makes it a crime of kidnapping for a person to unlawfully remove or confine a child with the intent to permanently deprive a parent of custody of the child. N.J.S.A. 2C:13-1b(4); N.J.S.A. 2C:13-1d.
Notably, when the statute was amended in 1999, the Legislature added certain affirmative defenses "which parallel those available for interference with custody." See Committee Statement, supra. If the victim is fourteen years old or older, the following affirmative defense applies:
e. It is an affirmative defense to a prosecution under paragraph (4) of subsection b. of this section, which must be proved by clear and convincing evidence, that:
....
(3) The victim, being at the time of the taking or concealment not less than 14 years old, was taken away at his own volition by his parent and without purpose to commit a criminal offense with or against the victim.
[N.J.S.A. 2C:13-1e.]
If the victim is under fourteen years old, as is the case here:
f. It is an affirmative defense to a prosecution under paragraph (4) of subsection b. of this section that a parent having the right of custody reasonably believed he was fleeing from imminent physical danger from the other parent, provided that the parent having custody, as soon as reasonably practicable:
(1) Gives notice of the victim's location to the police department ... the office of the county prosecutor ... or the Division of Youth and Family Services ...; or
(2) Commences an action affecting custody in an appropriate court.
g. As used in subsections e. and f. of this section, parent means a parent, guardian or other lawful custodian of a victim.
[N.J.S.A. 2C:13-1f and g.]
Subsection e(3) was included to "clarify that [the] defense applies only to a parent, guardian or other lawful custodian of the victim ... [because] [t]he committee felt that without such clarification persons could assert this defense inappropriately in cases such as those in which a minor may join a cult." See Committee Statement, supra. Subsections f and g were taken verbatim from the interference with custody statute. See N.J.S.A. 2C:13-4d.
Simultaneous with amending the kidnapping statute, the Legislature amended New Jersey's interference with custody statute. This statute makes it a crime for one parent to unlawfully interfere with the other's custody of their minor child. N.J.S.A. 2C:13-4a. Interference consists of taking or detaining the child with a purpose to conceal the child or deprive the child's parent of custody or parenting time; *576 taking the child outside the State for purpose of evading jurisdiction, custody or parenting time; and taking or concealing a child from the other parent in violation of a custody or parenting time order. Ibid. Historically, the crime of interference with custody was a crime of the third degree unless the child was "taken, detained, enticed or concealed outside the United States," which was a second-degree offense. N.J.S.A. 2C:13-4 (1998) (amended 1999). Bill No. 446 upgraded the offense to a second-degree crime where, even if the child is not taken out of the country, the "child is taken, detained, enticed or concealed" for more than twenty-four hours. See Committee Statement, supra. Otherwise, a violation of the statute remains a third-degree crime. N.J.S.A. 2C:13-4a.
Kindt does not dispute that he could be charged with violating the interference with custody statute, but he argues that as a father with joint custody of the children, he could not have violated the kidnapping statute. He claims the 1999 amendments to the kidnapping statute, which make it a violation of that statute to "permanently deprive a parent" of custody of the child, is not applicable to the child's other parent because the statute makes it unlawful to remove or confine a child only if "it is accomplished without the consent of a parent." N.J.S.A. 2C:13-1d. And, as the children's parent, he could consent to allow himself, or a third party (Froland) for that matter, to remove the children from their mother without being in violation of the statute. In dismissing the kidnapping charges against Kindt, the Law Division agreed; the judge found that the language without the consent of a parent literally means that the consent of either parent is sufficient to render the removal or confinement of the child lawful. We are not persuaded.
As part of the 1999 amendments, the Legislature adopted affirmative defenses that only apply to parents. N.J.S.A. 2C:13-1e, f and g. If a parent cannot be charged with kidnapping, these affirmative defenses are meaningless, a construction of the statute that is to be avoided. State v. Reynolds, 124 N.J. 559, 564, 592 A.2d 194 (1991).
A practical application of Kindt's interpretation of the statute also leads to an irrational result. In his view, a parent subject to a joint custody order can legally consent to a third party abducting his child because the conduct would not be unlawful, even if the child is taken without the other parent's consent. While we are mindful that "in criminal cases we are guided by the rule of lenity, which requires us to construe penal statutes strictly and interpret ambiguous language in favor of a criminal defendant[,]" State v. Livingston, 172 N.J. 209, 218, 797 A.2d 153 (2002), this rule does not require that a criminal statute be read in such a way as to lead to an illogical result. Statutes must be read sensibly. See Schierstead v. Brigantine, 29 N.J. 220, 230, 148 A.2d 591 (1959). We cannot conceive that the Legislature would have sanctioned a parent to give consent to a third party to remove a child subject to a joint custody order. Indeed, the statute prohibits exactly that conduct. See N.J.S.A. 2C:13-1b(4) ("[a] person is guilty of kidnapping if he unlawfully removes another ... [t]o permanently deprive a parent ... of custody of the victim").
The only sensible way to read the definition of unlawful is to conclude that a parent may only give consent to another person to remove his child if either no custody order is extant or, if a custody order has been entered, the non-consenting parent has no custody or parenting rights to the child. This construction avoids the result suggested by Kindt's interpretation of the *577 statute, and it is compatible with pertinent jurisprudence.
Generally, absent a custody order, a parent cannot be charged with the crime of kidnapping. State v. Butterfoss, 234 N.J.Super. 606, 614, 561 A.2d 312 (Law Div.1988); State v. Stocksdale, 138 N.J.Super. 312, 315, 350 A.2d 539 (Law Div.1975). The corollary being that a parent who abducts his or her child in violation of a custody order may be convicted of kidnapping the child. See State v. Holtcamp, 614 S.W.2d 389, 393 (Tenn.Crim.App.1980) (where father had visitation rights, taking of child by father without mother's consent was unlawful); see also State v. Johnson, 67 N.J.Super. 414, 423, 170 A.2d 830 (App. Div.1961) (under kidnapping statute as it existed prior to 1999 amendment, in dicta, we observed that generally, the taking of a child by one parent from the custody of the other may be kidnapping); In re Kelsey, 19 N.J. Misc. 488, 492-93, 21 A.2d 676 (Com.Pl.1941) (where child's mother had legal custody in Illinois, father could have been guilty of kidnapping had he intended to keep the child away from the mother by bringing the child to New Jersey without the mother's consent). This is so because a joint custody order contemplates that the rights of both parents shall be equal.... N.J.S.A. 9:2-4a. Thus, when both parents have equal rights to the children under a joint custody arrangement, neither parent [can] remove the children without infringing on the powers, rights and duties of the other. People v. Harrison, 82 Ill.App.3d 530, 37 Ill.Dec. 820, 402 N.E.2d 822, 824 (1980).
Here, under the parties' custody agreement, O'Connor had residential custody of the children. Given her custodial rights, if the State is able to prove that Kindt did not have O'Connor's consent prior to his removing the children that she consented only to relinquishing the children to him for the holiday, not to his permanent removal of them from her custody we "`cannot reasonably assume that the legislature would exempt a transgressing parent from what otherwise would constitute an act of [kidnapping] by any other person.'" Holtcamp, supra, 614 S.W.2d at 393 (quoting McNeely v. State, 181 Ind.App. 238, 391 N.E.2d 838, 840 (1979)).
This construction of the kidnapping statute gains support from the sentencing scheme embodied in both the interference with custody statute, N.J.S.A. 2C:13-4, and the kidnapping statute, N.J.S.A. 2C:13-1, in light of the 1999 amendments. The amendments make a person who removes a child with the intent to permanently deprive a parent of custody of the child criminally culpable of a first-degree offense, N.J.S.A. 2C:13-1b(4) and c; they also upgrade interference with custody to a second-degree offense if the child is taken or detained for more than twenty-four hours. N.J.S.A. 2C:13-4. In so doing, the Legislature established a comprehensive sentencing scheme that provides for increased penalties as the conduct of the actor becomes more serious. The sentencing scheme now provides:
(a) A third-degree offense: if the child is taken, detained, enticed or concealed within the United States for less than twenty-four hours. See N.J.S.A. 2C:13-4a(4).
(b) A second-degree offense: if the child is taken, detained, enticed or concealed either outside of the United States or for more than twenty-four hours. See Ibid.

(c) A first-degree offense: if the child is taken with an intent to permanently deprive the parent of custody of the child. See N.J.S.A. 2C:13-1b(4).
Put simply, removing the child for less than twenty-four hours is a third-degree offense; for more than twenty-four hours *578 a second-degree offense; and, if the removal is with the intent to permanently deprive the other parent of custody, the crime is a first-degree offense. We agree with the State that this sentencing scheme is evidence of a legislative intent to increase the level of punishment for increasingly serious conduct. Consequently, if the State can prove Kindt intended to permanently deprive O'Connor of custody of the children, which distinguishes kidnapping from interference with custody, Kindt's actions could fall within the parameters of kidnapping pursuant to N.J.S.A. 2C:13-1b(4). We therefore find that the trial court erred in dismissing the kidnapping charges against Kindt.

IV.
We now turn to Froland's appeal. Her first argument is that as a matter of law she could not have been convicted of kidnapping, because Kindt, as a custodial parent, consented to her taking the children. In other words, she makes the same argument as does Kindt, just in a different context: it was not "unlawful" for her to remove the children, because pursuant to N.J.S.A. 2C:13-1d, Kindt, the children's father, consented to her actions. In that we have found that Kindt could not lawfully remove the children from their mother, neither could Froland. Just as Kindt can be culpable under the kidnapping statute, so could Froland. Neither were legally capable of providing the consent contemplated by N.J.S.A. 2C:13-1d.[4]
Froland next argues that the verdict was beyond the weight of the evidence because she never intended to permanently deprive the children's mother of their custody and because Kindt acted unilaterally. This argument is both procedurally defective and substantively without merit.
First, because Froland did not move for a new trial before the Law Division on the grounds that the verdict was against the weight of the evidence, she is procedurally barred from raising that issue on appeal. See R. 2:10-1. Second, substantively, the evidence was sufficient for the jury to conclude that Froland actively participated with Kindt to plan the abduction, and took affirmative acts to kidnap the children, both as a principal and an accomplice.
Froland's diary, written in her own hand, said:
We had been awake all night putting together all the last minute pieces that are invariably involved in disappearing from the face of the earth. This had been going on nearly 24 hours a day for 2 weeks. We were exhausted dreaming of sleeping through an entire first . . . week of hard won invisibility.
She obtained a copy of her daughter's birth certificate so she and her daughter could obtain passports, which they did. She assisted Kindt in obtaining medical records for J.K., O.K. and S.F. She withdrew significant sums of money from her accounts, totaling about $50,000, to help finance the abduction.
Froland sent a letter to her mother informing her that she and Kindt had taken the children and intended to get to a jurisdiction friendly to their position. She said she had "two options: either leave the *579 children, or take them." She further explained:
[I]t is not our intention to take [J.K.] and [O.K.] away from their mother ... [i]t is our intention to establish possession of the children, create a new status quo, and remove ourselves to somewhere far enough away that [O'Connor's] father's influence will not be able to taint the judicial process.... [W]e also believe very strongly (and the Bible supports us) that the father is the head of the household. He is held personally accountable to God for how his children turn out and is therefore responsible for all instruction, reproof, guidance, and discipline. There are court systems out there that support this belief and that will actually study the claims and subsequent requests that we are making.
....
Please know that this was a very difficult decision for us to make and that it was not made in haste.
Froland's diary and the letter to her mother, in light of the other trial evidence, were sufficient for a jury to conclude that she had the intent to kidnap the children; she conspired with Kindt to do so; and she took affirmative steps to carry out the abduction.
Froland claims she did not intend to harm the children, nor were they in fact harmed. The section of the kidnapping statute under which Froland was charged, N.J.S.A. 2C:13-1b(4), does not, however, call for harm to the child as an element of the crime. Thus, whether the children were physically or psychologically harmed by the abduction is irrelevant to Froland's conviction.
Next, she argues she was improperly charged with both kidnapping and interference with custody; she claims that at most, she should only have been charged with interference with custody. In essence, she claims the prosecutor abused his charging function.
The difference between subsection b(4) of the kidnapping statute and the interference with custody statute "is that kidnapping requires an intent to deprive permanently rather than just to deprive a parent or guardian of some parenting time." Cannel, New Jersey Criminal Code Annotated, comment 3 on N.J.S.A. 2C:13-1 (2005). Under the facts here, the State acted fully within its discretion to charge Froland with kidnapping, interference with custody, or both. Simply because N.J.S.A. 2C:13-1 may potentially overlap in some respects with N.J.S.A. 2C:13-4 does not preclude prosecution under both statutes. As long as an overlapping criminal provision "clearly define[s] the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied." United States v. Batchelder, 442 U.S. 114, 123, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755, 764 (1979); State v. Kittrell, 145 N.J. 112, 127-28, 678 A.2d 209 (1996); State v. Medina, 349 N.J.Super. 108, 127-28, 793 A.2d 68 (App.Div.) ("`[s]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to ... bring before a grand jury, generally rests entirely in his discretion'") (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604, 611 (1978)), certif. denied, 174 N.J. 193, 803 A.2d 1165 (2002). A prosecutor has broad charging discretion, with which we should be hesitant to interfere. State v. T.C., 347 N.J.Super. 219, 229, 789 A.2d 173 (App.Div.2002), certif. denied, 177 N.J. 222, 827 A.2d 289 (2003).
Nevertheless, Froland implies that the prosecutor vindictively charged *580 her with kidnapping. She makes this statement substantially based on O'Connor's father's, in his capacity as county counsel, prior legal representation of the prosecutor. No doubt, if it can be demonstrated that a prosecutor vindictively charged a defendant, the charges may be dismissed as a violation of the defendant's constitutional rights. See Blackledge v. Perry, 417 U.S. 21, 28-29 94 S.Ct. 2098, 2103, 40 L.Ed.2d 628, 634-35 (1974). But, Froland's argument fails for two reasons. First, she failed to challenge the indictment pretrial, so she is procedurally barred from challenging the charges now. R. 3:9-1(d); R. 3:10-2(a).
Second, the "`mere opportunity for vindictiveness is insufficient to justify'" a presumption of vindictiveness. State v. Long, 119 N.J. 439, 466-67, 575 A.2d 435 (1990) (quoting United States v. Goodwin, 457 U.S. 368, 384, 102 S.Ct. 2485, 2494, 73 L.Ed.2d 74, 87 (1982)). Here, Froland's claims of vindictiveness are mere speculation, without factual basis. She is unable to establish any realistic likelihood that the prosecutor vindictively brought the kidnapping charges. And notably, the trial record fully supported those charges.
Froland's remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

V.
We affirm the judgment of conviction in State v. Stacey Froland, A-4741-02. We reverse the order dismissing the kidnapping charges in State v. John Kindt, A-7136-03, reinstate those charges, and remand for further proceedings consistent with this opinion.
NOTES
[1] We consolidate the appeals for purposes of this opinion.
[2] Aronson, while charged with kidnapping, has not yet been tried. He is not party to this appeal.
[3] In Kindt's brief in opposition to the State's appeal, he raises issues unrelated to the issue for which leave to appeal was granted. They are not properly before us as Kindt did not cross-move for leave to appeal those issues. See R. 2:3-4(a).
[4] While not raised in a point heading, Froland argues that the court should have charged the jury that Kindt could have consented to removal of the children. Notwithstanding that because the issue was not raised in a point heading it is technically waived, R. 2:6-2(a)(5); Universal-Rundle Corp. v. Commercial Union Ins. Co., 319 N.J.Super. 223, 246 n. 8, 725 A.2d 76 (App.Div.), certif. denied, 161 N.J. 149, 735 A.2d 574 (1999), substantively, the argument is without merit for the reasons we have discussed.