936 A.2d 947

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT
v. STACEY FROLAND A/K/A STACEY KINDT,
DEFENDANT–APPELLANT.

Argued September 10, 2007—Decided December 12, 2007.
As Modified Feb. 27, 2008.

*Michael B. Jones,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Daniel I. Bornstein,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General of New Jersey, attorney).

*Stacey Froland–Kindt,* submitted a brief, pro se.

Justice LONG delivered the opinion of the Court.

At issue in this appeal is whether a stepmother who removes her stepchildren from the state with the consent of their father (her husband), but without the consent of their mother, is guilty of non-consent kidnapping under *N.J.S.A.* 2C:13–1. The Appellate Division upheld the stepmother's kidnapping conviction under the circumstances described above. We granted certification and now reverse. Although subject to a charge of kidnapping by "force, threat or deception" under *N.J.S.A.* 2C:13–1(d), and to a charge of interference with custody under *N.J.S.A.* 2C:13–4(a), a party who acts with the permission of a parent is not guilty of non-consent kidnapping. Because the State did not pursue force, threat or deception kidnapping in this case, the stepmother's conviction cannot stand.

I

In 1985, John Kindt married Anne O'Connor. The couple adopted two children, J.K. and O.K. In November 1996, while living in California, Kindt and O'Connor separated; O'Connor moved back to her family in New Jersey, taking J.K. and O.K. with her. The parties later divorced. The New Jersey decree afforded them joint custody [1] of the children with O'Connor as the parent of primary residence, and Kindt as the parent of alternative residence. The judgment also provided that Kindt would have "reasonable and liberal parenting time" whenever he was in

---

[1] "Under a joint custody arrangement legal custody—the legal authority and responsibility for making 'major' decisions regarding the child's welfare—is shared at all times by both parents." *Beck v. Beck,* 86 *N.J.* 480, 486–87, 432 *A.*2d 63 (1981).

New Jersey, and that the children's holiday and vacation time would be divided in a "reasonable and fair fashion." In the event that Kindt and O'Connor ever lived "in the relative vicinity of each other," the children would live with both "on a schedule to be agreed upon by the parties." Regular visitation between Kindt and the children took place.

In April 2000, Kindt married Stacey Froland–Kindt ("Froland"). Two months later, the couple moved to Brick, New Jersey, where they rented a single-family house in which they lived with Froland's infant daughter, S.F., and Kindt's nineteen-year-old nephew, Matthew Aronson.

After Kindt moved to New Jersey, he and O'Connor agreed on a shared physical custody scheme.[2] The children stayed with Kindt until seven o'clock in the evening on Tuesdays and Thursdays, and spent every other weekend with him. Kindt and O'Connor followed that schedule for about six months. The situation between the parents apparently deteriorated in November 2000, when Kindt began to keep the children overnight instead of returning them to O'Connor at the required hour.

In December 2000, O'Connor obtained a court order prohibiting Kindt from interfering with the custody of the children after seven p.m. on Tuesdays, Thursdays, and every other Sunday. If Kindt failed to comply, the order would be deemed a directive to any law enforcement officer to aid O'Connor in retrieving the children. The order also enforced a prior judgment that required Kindt to pay O'Connor $100,000 in equitable distribution by December 31, 2000. Failing payment by that date, Kindt would be subject to an application for a bench warrant.

O'Connor had custody of the children during the Christmas holidays in 2000. She agreed, however, that Kindt would have the

---

[2] Under such an arrangement, parents share the companionship of the child. Each is responsible for "minor" day-to-day decisions and the living arrangement may be alternated in accordance with the needs of the parties and children. *Beck, supra,* 86 *N.J.* at 487, 432 *A.2d* 63.

children from Wednesday, December 27, through the morning of Saturday, December 30. On December 27, O'Connor dropped the children off at Kindt's house. On Friday, December 29, she called to talk to the children, but Kindt's phone had been disconnected. That evening, O'Connor drove to Kindt's house and found that no one was home. The following day, she returned to the house and again found it to be deserted. O'Connor then filed a missing children's report. On December 31, 2000, the Wall Township Police Department began an investigation.

The investigation ultimately revealed that Kindt and Froland had devised a plan to remove J.K. and O.K. from New Jersey without O'Connor's consent. They obtained birth certificates for the children and themselves along with copies of the children's medical records. During the month of December, Froland withdrew a large amount of money from her two bank accounts and filled out a change-of-address form to have the family's mail forwarded to Buffalo, New York. Around mid-December, Kindt flew to North Carolina where, using a pseudonym, he bought a boat.

During the last week of December 2000, Kindt and Froland finalized their plan. On December 26, Froland created a "to do" list on her computer that included, among other things, cutting the phone lines and ceasing communications with relatives. On December 27, Froland typed a letter to her mother stating, in part, that she and Kindt intended to "establish possession of the children, create a new status quo, and remove [themselves] to somewhere far enough away" so that O'Connor's father, who was a former county counsel of Monmouth County, would not be able to "taint the judicial process."

On December 28, Kindt sent a letter to his parents acknowledging that he was going to take the children away. On December 29, Froland prepared a letter to Kindt's mother providing her with detailed instructions about what to do with the family's possessions and existing financial obligations once Kindt and Froland had left New Jersey.

On December 29, 2000, Kindt, Froland, Aronson, S.F., J.K., and O.K. left the house and traveled to Newark Airport. After a series of maneuvers intended to cover their trail, all six took public transportation to Oriental, North Carolina. Once in Oriental, the group stayed at a bed and breakfast for about ten or twelve days.

During that time, warrants were issued for the arrest of Kindt and Froland for the abduction of the children. Kindt then purchased a larger boat, a transaction that came to the attention of the investigators in New Jersey. The New Jersey authorities notified the United States Coast Guard of the outstanding warrants. On January 22, 2001, the Coast Guard received a distress signal from a boat off the coast of North Carolina that had become disabled due to engine failure. Aboard the vessel, the Coast Guard found Kindt, Froland, Aronson, S.F., J.K., and O.K.

The authorities arrested Kindt, Froland, and Aronson, and placed the children into protective custody. On the boat, investigators found birth certificates; passports; nautical charts; Froland's diary; four computer hard drives; and books entitled "Passages South," "Cruising with Children," "Hide Your Assets and Disappear," and "How to be Invisible." On January 23, 2001, O'Connor traveled to North Carolina and was reunited with J.K. and O.K.

On October 27, 2002, a Monmouth County Grand Jury issued a superseding, eight-count indictment against Kindt, Froland, and Aronson. The indictment charged all three defendants with two counts of first-degree kidnapping (*N.J.S.A.* 2C:13–1(b)), two counts of second-degree interference with custody (*N.J.S.A.* 2C:13–4(a)), two counts of third-degree attempted interference with custody (*N.J.S.A.* 2C:5–1), and second-degree conspiracy to commit kidnapping and/or interference with custody (*N.J.S.A.* 2C:5–2). Kindt and Froland were separately charged with fourth-degree contempt of court. *N.J.S.A.* 2C:29–9.

The defendants' cases were severed with Froland's proceeding first. At trial, the facts outlined above were established. Over Froland's objection, the judge instructed the jurors that her

removal or confinement of the children was unlawful if it was accomplished without the consent of Anne O'Connor, even if Kindt, the children's father, consented to it. The jury returned guilty verdicts against Froland for first-degree kidnapping, second-degree interference with custody, fourth-degree contempt of court, and second-degree conspiracy. She was acquitted of third-degree attempted interference with custody. After merging the interference convictions into the kidnapping convictions and reducing the kidnapping convictions to second-degree offenses, the trial judge sentenced Froland to an aggregate custodial term of seven years. She appealed.[3]

Before his case went to trial, Kindt's motion to dismiss the kidnapping charges was granted. In ruling, the trial judge determined that the plain language of the kidnapping statute prohibited the State from prosecuting Kindt for the crime of kidnapping his own children. The State sought leave to appeal. After consolidating the appeals, the Appellate Division affirmed Froland's conviction and reversed the order dismissing the kidnapping charges against Kindt. *State v. Froland*, 378 *N.J.Super.* 20, 39–40, 874 *A.*2d 568 (App.Div.2005). In ruling, the Appellate Division characterized kidnapping and interference with custody as overlapping statutes over which the prosecutor has discretionary charging power. In addition, the panel concluded that a parent with joint custody cannot "consent" to his child's removal and that, if Kindt and Froland intended to "permanently deprive" O'Connor of custody, they were subject to prosecution for kidnapping.[4] We granted Froland's petition for certification. 187 *N.J.* 82, 899 *A.*2d 304 (2006).

---

[3] Froland is currently on parole after serving sixteen months of her seven-year sentence.

[4] On remand, a jury found Kindt not guilty of kidnapping, but convicted him on all other counts. After appropriate mergers, the trial judge sentenced Kindt to a custodial term of seven years. Kindt is currently living in a halfway-house pending the outcome of his appeal.

## II

Froland argues that under the plain language of *N.J.S.A.* 2C:13–1(d), a parent cannot be guilty of kidnapping his own children, and that she in turn cannot be guilty of kidnapping because she acted with a parent's permission. She further argues that she cannot be guilty of kidnapping in the absence of harm to the children, and that the statute is unconstitutionally vague. Finally, she claims that if the statute is ambiguous, the doctrine of lenity requires it to be interpreted in her favor.

The State counters that the kidnapping statute does not immunize parents but contemplates a conviction of a parent; that the affirmative defenses the Legislature added to the kidnapping statute in 1999, which specifically refer to custodial parents, inform the meaning of the word "parent" and underscore that a parent can be guilty of kidnapping his own child; that it is no defense to a charge of kidnapping that the defendant acted with the consent of a parent unless that parent had exclusive custody of the child or no court order addressing custody exists. If Kindt can be guilty, the State argues Froland can also be convicted of kidnapping. Moreover, the State claims that even if Kindt is immune from a kidnapping prosecution, Froland is not.

## III

Because the meaning of the kidnapping statute is at the heart of this case, the rules governing statutory interpretation are pivotal. When interpreting a statute, our paramount goal is to determine the Legislature's intent. *State v. Crawley,* 187 *N.J.* 440, 452, 901 *A.*2d 924 (2006). To do so, we first examine the plain language of the statute and ascribe to the words their ordinary meaning. *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). "It is not the function of th[e] Court to 'rewrite a plainly-written enactment of the Legislature [ ] or presume that the Legislature intended something other than that expressed by way of the plain language.'" *Ibid.* (quoting *O'Connell v. State,* 171

*N.J.* 484, 488, 795 *A.*2d 857 (2002)). In other words, if the statute is clear on its face, the inquiry ordinarily ends.

■ However, if the plain language of the statute is susceptible to more than one interpretation, we may consider sources other than the language in determining its meaning. *Aponte–Correa v. Allstate Ins. Co.,* 162 *N.J.* 318, 323, 744 *A.*2d 175 (2000). For example, we often examine the legislative history of the enactment, *DiProspero, supra,* 183 *N.J.* at 492–93, 874 *A.*2d 1039, and look to cognate statutory provisions. *G.S. v. Dep't of Human Servs.,* 157 *N.J.* 161, 172, 723 *A.*2d 612 (1999).

■ In criminal cases, interpretation of a statute is restricted by the rule of lenity which requires us to strictly construe penal statutes in favor of a criminal defendant. *State v. D.A.,* 191 *N.J.* 158, 164, 923 *A.*2d 217 (2007); *see also* Norman J. Singer, 3 *Sutherland Statutory Construction* § 59.3, 134 (6th ed. 2001) ("The rule of lenity should only be applied if after reviewing all sources of legislative intent the statute still remains ambiguous."). Those are the legal principles that guide our analysis.

## IV

We turn first to the relevant words of the kidnapping statute:

a. Holding for ransom, reward or as a hostage. A person is guilty of kidnapping if he unlawfully removes another from the place where he is found or if he unlawfully confines another with the purpose of holding that person for ransom or reward or as a shield or hostage.

b. Holding for other purposes. A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period, with any of the following purposes:

(1) To facilitate commission of any crime or flight thereafter;

(2) To inflict bodily injury on or to terrorize the victim or another;

(3) To interfere with the performance of any governmental or political function; or

(4) To permanently deprive a parent, guardian or other lawful custodian of custody of the victim.

. . .

d. "Unlawful" removal or confinement. A removal or confinement is unlawful within the meaning of this section and of sections 2C:13–2 and 2C:13–3, if it is accomplished by force, threat or deception, or, in the case of a person who is under the age of 14 or is incompetent, if it is accomplished without the consent of a parent, guardian or other person responsible for general supervision of his welfare.

. . .

f. It is an affirmative defense to a prosecution under paragraph (4) of subsection b. of this section that a parent having the right of custody reasonably believed he was fleeing from imminent physical danger from the other parent, provided that the parent having custody, as soon as reasonably practicable:

(1) Gives notice of the victim's location to the police department of the municipality where the victim resided, the office of the county prosecutor in the county where the victim resided, or the Division of Youth and Family Services in the Department of Children and Families; or

(2) Commences an action affecting custody in an appropriate court.

g. As used in subsections e. and f. of this section, "parent" means a parent, guardian or other lawful custodian of a victim.

[*N.J.S.A.* 2C:13–1.]

On its face, the statute interdicts the "unlawful" removal or confinement of another for specific purposes—in this case to permanently deprive a parent, guardian or other lawful custodian of custody of the victim. Removal for a prohibited purpose, standing alone, does not satisfy the statutory elements. A removal is only "unlawful" in two instances—if it is effectuated by "force, threat or deception" or if it is done without the "consent of a parent, guardian or other person responsible for general supervision of [the child's] welfare." Because no claim of force, threat or deception was presented to the jury in this case, Froland's conviction can only stand if she removed the children "without the consent of a parent."

■ Froland's essential argument is that, because she had the consent of Kindt, who is "a parent," her conviction must be overturned. Facially, that argument is persuasive. The word "parent" has a well-established meaning in common parlance. *See Merriam–Webster's Collegiate Dictionary* 844 (10th ed. 1994) (defining "parent" as "one that begets or brings forth offspring"). It has a similar connotation in legislation. *See N.J.S.A.* 9:3–38 (defining "parent" as "a birth parent or parents, including the

birth father of a child born out of wedlock who has acknowledged the child or to whom the court has ordered notice to be given, or a parent or parents of adoption").

The State counters that Froland's reliance on the common meaning of the word "parent" is too simplistic because it fails to take into account the details of judicial custody orders that affect parental status. In the State's view, only a parent with sole custody or with no custody order limiting his or her parental rights can consent to removal and, as a result, a parent with joint custody must obtain the consent of the other parent.

■ We agree with Froland that the term "parent" in the kidnapping statute should be given its plain and ordinary meaning—a father or mother related to a child genetically or by adoption. The Legislature could have qualified the word "parent" in the consent prong of the kidnapping statute based upon judicially decreed custodial status. It did not do so. Without such legislative direction, we are not free to superimpose on the ordinary meaning of the word "parent" the State's catalogue of distinctions based upon the particulars of a judicial order. To be sure, the Court may supply terms omitted by the Legislature if it is clear that they are necessary to manifest the legislative intent. *Bd. of Chosen Freeholders v. State*, 159 *N.J.* 565, 576, 732 *A.*2d 1053 (1999). That is not the case here. Indeed, the use of the term "parent having the right of custody" in the affirmative defenses indicates that the Legislature understood how to impose conditions on the word "parent," but chose not to do so in the consent section of the statute. *N.J.S.A.* 2C:13–1(f); *see, e.g., State v. Hoffman*, 149 *N.J.* 564, 695 *A.*2d 236 (1997) (acknowledging Legislature's conscious decision to use the term "annoyance" rather than "serious annoyance" as evidence of intent).

Moreover, we reject the State's contention that even if Kindt is insulated from a kidnapping charge, Froland remains liable. That notion is based solely on case law interpreting statutes that are unlike *N.J.S.A.* 2C:13–1 in that they do not expressly immunize persons acting "with the consent of a parent." *See, e.g., State v.*

*Stocksdale,* 138 *N.J.Super.* 312, 350 *A.2d* 539 (Law Div.1975) (adjudging parent's coconspirator's kidnapping indictment under then-enacted *N.J.S.A.* 2A:94–1). In short, we read the plain language of the statute as empowering Kindt to consent to his children's removal and as concomitantly immunizing Froland from a kidnapping conviction based on that consent.

That is not to suggest that the kind of conduct Kindt and Froland engaged in is immune from punishment. As we have noted, if the removal had been accomplished by force, threat or deception, a kidnapping conviction could be sustained against a parent and his accomplice. That is the reason for the affirmative defense that the statute prescribes with respect to a parent and upon which the Appellate Division relied.

Moreover, Froland's behavior falls squarely within the strictures of the interference with custody statute that provides in relevant part:

Custody of children. A person, including a parent, guardian or other lawful custodian, is guilty of interference with custody if he:

(1) Takes or detains a minor child with the purpose of concealing the minor child and thereby depriving the child's other parent of custody or parenting time with the minor child; or

(2) After being served with process or having actual knowledge of an action affecting marriage or custody but prior to the issuance of a temporary or final order determining custody and parenting time rights to a minor child, takes, detains, entices or conceals the child within or outside the State for the purpose of depriving the child's other parent of custody or parenting time, or to evade the jurisdiction of the courts of this State; or

(3) After being served with process or having actual knowledge of an action affecting the protective services needs of a child pursuant to Title 9 of the Revised Statutes in an action affecting custody, but prior to the issuance of a temporary or final order determining custody rights of a minor child, takes, detains, entices or conceals the child within or outside the State for the purpose of evading the jurisdiction of the courts of this State; or

(4) After the issuance of a temporary or final order specifying custody, joint custody rights or parenting time, takes, detains, entices or conceals a minor child from the other parent in violation of the custody or parenting time order. [*N.J.S.A.* 2C:13–4(a).]

Although the Appellate Division viewed kidnapping and interference with custody as overlapping criminal provisions, in fact, the

statutes were not intended to overlap but were designed to address entirely distinct conduct. The interference with custody statute was "a new frontier" in the area of interfamily removals that kidnapping was not designed to reach. *People v. Algarin*, 200 *Ill.App.*3d 740, 146 *Ill.Dec.* 494, 558 *N.E.*2d 457, 461 (reading term "parent" colloquially under Illinois kidnapping statute), *appeal denied*, 133 *Ill.*2d 560, 149 *Ill.Dec.* 325, 561 *N.E.*2d 695 (1990); *see also State v. Goodman*, 90 *S.W.*3d 557, 564–65 (Tenn.2002) (citing Legislature's use of word "parent" rather than phrase "custodial parent" as evidence of plain and clear meaning); *Johnson v. State*, 637 *So.*2d 3 (Fla.Dist.Ct.3d Dist.) (finding Florida kidnapping statute inapplicable to biological parent), *review denied*, 649 *So.*2d 235 (Fla.1994), *aff'd*, 655 *So.*2d 244 (Fla.Dist.Ct. App.3d Dist.1995).

## V

The legislative history of the statute supports our conclusion. In 1968, the New Jersey Legislature formed a Criminal Law Revision Commission ("Commission") to revise the penal laws of the State. Senate Judiciary Committee, *Statement to Senate Bill No. 738*, at 1 (May 15, 1978). Ultimately, the Legislature accepted the Commission's findings and implemented a revised criminal code. *See id.* at 1–17; Martin L. Greenberg & John J. Tumulty, *Highlights of the New Code of Criminal Justice*, 104 *N.J.L.J.* 449, 449 (1979). Included in the new code were the new kidnapping laws, which the Commission drafted after concluding the then-existing laws were too broad. 2 *Final Report of New Jersey Criminal Law Revision Commission*, commentary to § 2C:13–1, 181 (1971).

In revising the kidnapping statutes, the Commission substantially adopted the approach of the American Law Institute's Model Penal Code ("MPC"). *Id.* at 181. To restrict the severe penalties authorized for kidnapping, the MPC limited its scope "to cases of substantial removal or confinement for certain enumerated purposes": (1) holding the victim for ransom; (2) facilitating the

commission of a crime; (3) harming the victim; or (4) interfering with the performance of a government function. *Model Penal Code and Commentaries,* § 212.1 ("MPCC").

The unlawful purposes delineated in *N.J.S.A.* 2C:13–1(d) of the statute are identical to the MPC, likewise declaring "unlawful" a removal "accomplished by force, threat or deception or, in the case of a person who is under the age of 14 or incompetent, if it is accomplished without the consent of a parent, guardian or other person responsible for general supervision of his welfare." *N.J.S.A.* 2C:13–1(d). The drafters of the MPC commented extensively on the definition of "unlawful" when addressing the cognate interference with custody statute. *See MPCC, supra,* § 212.4 cmt. at 253–55. They noted that "a parent may kidnap his own child ..., just as a stranger may kidnap any innocent victim" *if the parent "engages in the primary conduct by force, threat, or deception." Id.* at 253 (emphasis added). The drafters determined, however, that where the parent does *not* engage in the primary conduct by force, threat or deception, and where the victim of the taking is under fourteen, a parent or one acting with the consent of a parent is not acting "unlawfully" within the meaning of the kidnapping statute:

> [I]f a parent abducts his own underage child ..., kidnapping is not made out *even if the actor's conduct is offensive to legally awarded custody in another person or institution.* The purpose of so construing this language is to discourage involvement of the kidnapping offense in an area where it does not belong—in this instance in the enforcement of custody decrees and the resolution of intra-family disputes.
>
> [*Id.* at 254 (emphasis added).]

The drafters further explained:

> One can imagine cases where it might be appropriate to seek a kidnapping conviction in [a situation involving a parent taking his or her own underage child]. For example, a divorced husband might seek revenge against his former wife, to whom custody of an underage child has been awarded, by enticing the child away and seeking ransom or threatening the welfare of the child....
>
> Section 212.1 was drafted on the premise that it will be possible to prove "force, threat, or deception" as a part of the taking in cases of this character. The special definition of "unlawful" with respect to underage children ... was not designed to broaden the coverage of Section 212.1 in the case of intra-family disputes. Rather,

it was designed to deal with *strangers to the family* who gain the willing "consent" of an underage child to what in substance is a terrorizing abduction.

[*Id.* at 254 n. 13 (emphasis added).]

The drafters also posited the irrelevancy of custody arrangements to the analysis:

Viewed in this matter, the applicability of Section 212.1 to a case where the abduction of a child is by a parent *should not turn on the interference or noninterference of the parent with the formal custody arrangements.* A proper kidnapping prosecution can be made out even though the abducting parent is fully entitled to legal custody of the child. Such a case will turn on the presence of "force, threat, or deception" together with the remaining elements of the offense.

[*Ibid.*]

Like the MPC, our revised criminal code intentionally omits from the list of kidnapping purposes the situation "where a parent out of affection takes his child away from the other parent or lawful custodian." 2 *Final Report of New Jersey Criminal Law Revision Commission, supra,* commentary to *N.J.S.A.* 2C:13–1, 185 (quoting *MPCC, supra,* § 212.1 cmt. at 228). As the history reveals, the Legislature clearly intended to carve out of the kidnapping statute noncustodial parents who seek to obtain more favorable custodial control over their children without the use of threat, force or violence.

To address the problem of child-stealing, the Commission followed the MPC and recommended the enactment of a separate interference with custody statute. *See MPCC, supra,* § 212.4 cmt. at 249; 2 *Final Report of New Jersey Criminal Law Revision Commission, supra,* commentary to *N.J.S.A.* 2C:13–4, at 188. By its very terms, the interference with custody statute addresses the parent's effort to deprive "the other parent of custody or parenting time."

The interference with custody statute covers ground not included in the kidnapping statute by focusing on the rights of "the child's other parent," who is the victim of the interference crime. Interference with custody is a serious offense with heavy penalties:

Interference with custody is a crime of the second degree if the child is taken, detained, enticed or concealed: (i) outside the United States or (ii) for more than 24

hours. Otherwise, interference with custody is a crime of the third degree but the presumption of non-imprisonment set forth in subsection e. of *N.J.S.A.* 2C:44–1 for a first offense of a crime of the third degree shall not apply.

[*N.J.S.A.* 2C:13–4.]

The clear legislative history supports the conclusion that the kidnapping and interference with custody statutes address different evils. Thus, absent any evidence of "force, threat or deception," Froland could not be convicted of kidnapping because she had the consent of Kindt who is clearly a "parent" within the meaning of the statute. Rather, both of them were subject to prosecution under the interference with custody statute.

## VI

■ We note that, in reaching its decision that Froland can be guilty of first-degree kidnapping, the Appellate Division overlooked a fundamental canon of statutory interpretation—that courts are bound to strictly construe penal statutes. *See D.A., supra,* 191 *N.J.* at 164, 923 *A.*2d 217. The rule of lenity "has at its heart the requirement of due process. No one shall be punished for a crime unless both that crime and its punishment are clearly set forth in positive law." *In re Suspension of License of DeMarco,* 83 *N.J.* 25, 36, 414 *A.*2d 1339 (1980). Thus, even if we viewed the kidnapping statute as ambiguous regarding the "consent of a parent" (which, for the reasons previously expressed we do not) the rule of lenity would require that the statute be interpreted in Froland's favor with the exact result we have reached here—that her conviction for kidnapping cannot stand.

## VII

The judgment of the Appellate Division affirming the kidnapping convictions is reversed. The matter is remanded to the trial judge for proceedings consistent with the principles to which we have adverted.

Justice RIVERA–SOTO, dissenting.

The Appellate Division succinctly noted that "[t]he predominant issue in [this] case is whether a parent with joint custody can be

guilty of kidnapping his or her own child." *State v. Froland,* 378 *N.J.Super.* 20, 25, 874 *A.*2d 568 (App.Div.2005). In the particularly egregious facts presented in this case—where one parent absconds with the children with the obvious intent to permanently deprive the other parent of any contact with the children, leaving behind no clue as to their whereabouts or well-being—the panel concluded that "the kidnapping statute applies to such a parent." *Ibid.*

For the plain, common sense and rational reasons so aptly set forth in the Appellate Division's opinion, the kidnapping statute, *N.J.S.A.* 2C:13-1, certainly applies to those instances where a parent, even one with joint custody, secretly steals the children with the purpose and effect of taking them without the other custodial parent's consent. Because those self-evident reasons are rejected by the majority, and based on them, I respectfully dissent.

*For reversal and remandment*—Chief Justice RABNER, and Justices LONG, LaVECCHIA, WALLACE, AND HOENS—5.

*For affirmance*—Justice RIVERA–SOTO—1.